**Exhibit 1**

**Matthew M. Clarke, TSB # 24070965**
**Dugan P. Kelley, TSB # 24066627**
**Kenton S. Brice, TSB # 24069415**
**CHRISTMAN, KELLEY & CLARKE, PC**
2570 Justin Road, Suite 240
Highland Village, Texas 75077
Telephone: (925) 253-4440
Facsimile: (866) 611-9852
E-mail:     matt@christmankelley.com
            dugan@christmankelley.com
            kenton@christmankelley.com


**Bruce C. Jones, ISB #3177**
**Eric B. Swartz, ISB #6396**
**JONES & SWARTZ, PLLC**
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, Idaho 83707-7808
Telephone: (208) 489-7808
Facsimile: (208) 789-8988
E-mail:     bruce@jonesandswartzlaw.com
            eric@jonesandswartzlaw.com

**Attorneys for Defendants and Counterclaimants Lee P. Enright and Nancy K. Enright**


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| BANK OF AMERICA, N.A., | Case No. 1:11-cv-656-EJL |
| Plaintiff, | **SECOND AMENDED ANSWER OF DEFENDANTS LEE P. ENRIGHT AND NANCY K. ENRIGHT TO COMPLAINT OF PLAINTIFF BANK OF AMERICA, N.A. AND FIRST AMENDED COUNTERCLAIMS OF DEFENDANTS AGAINST PLAINTIFF BANK OF AMERICA, N.A. AND COUNTERDEFENDANT MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. (AS SUCCESSOR BY MERGER OF BANC OF AMERICA INVESTMENT SERVICES, INC.)** |
| v. | |
| LEE P. ENRIGHT and NANCY K. ENRIGHT, husband and wife, | |
| Defendants. | |

LEE P. ENRIGHT and NANCY K. ENRIGHT, husband and wife,

        Counterclaimants,

v.

BANK OF AMERICA, N.A.; and MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. (AS SUCCESSOR BY MERGER OF BANC OF AMERICA INVESTMENT SERVICES, INC.),

        Counterdefendants.

COMES NOW the Defendants, Lee P. Enright and Nancy K. Enright (collectively, "Defendants"), for themselves, hereby files this Second Amended Answer of Defendants to Complaint of Plaintiff Bank of America, N.A. ("BOA" or "Plaintiff") and First Amended Counterclaims of Defendants Against Plaintiff and Counterdefendant Merrill Lynch, Pierce, Fenner and Smith, Inc. (as successor by merger of Banc of America Investment Services, Inc.), as follows:

## SECOND AMENDED ANSWER TO COMPLAINT OF BANK OF AMERICA, N.A.

### PARTIES, JURISDICTION AND VENUE

1.      In answer to paragraph 1 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 1 of the Complaint, and based thereon deny such allegations.

2.      Defendants admit to the allegations stated in paragraph 2 of the Complaint.

3.      Defendants admit to the allegations stated in paragraph 3 of the Complaint.

4.      Defendants admit to the allegations stated in paragraph 4 of the Complaint.

5.      Paragraph 5 of the Complaint contains legal assertions or conclusions to which no responsive pleading is required.  Except as expressly admitted herein, Defendants deny the rest and remainder of paragraph 5.

## GENERAL ALLEGATIONS

### Overview

6.      In answer to paragraph 6 of the Complaint, the allegations state legal conclusions to which no responsive pleading is required.  Insofar as a responsive pleading is required as to any of the allegations stated in paragraph 6 of the Complaint, they are denied.

7.      Defendants admit to the allegations stated in paragraph 7 of the Complaint.

8.      Defendants admit to the allegations stated in paragraph 8 of the Complaint.

### The First Deed of Trust

9.      In answer to paragraph 9 of the Complaint, Defendants admit that they executed the Promissory Note in favor of Plaintiff in the original principal amount of $3.9 million.

10.      In answer to paragraph 10 of the Complaint, Defendants admit that they executed the First Deed of Trust.  Defendants lack knowledge or information sufficient to admit or deny the balance of the allegations contained in paragraph 10 of the Complaint, and based thereon deny such allegations.

11.      In answer to paragraph 11 of the Complaint, Defendants admit that the First Deed of Trust was recorded on July 12, 2006, as instrument number 537316.  However, Defendants lack knowledge or information sufficient to admit or deny whether the recordation was "proper," and based thereon deny such allegations.

12.      In answer to paragraph 12 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 12 of the Complaint,

and based thereon deny such allegations.

13.     In answer to paragraph 13 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 13 of the Complaint, and based thereon deny such allegations.

14.     In answer to paragraph 14 of the Complaint, the allegations state legal conclusions to which no responsive pleading is required.  Insofar as a responsive pleading is required as to any of the allegations stated in paragraph 14 of the Complaint, they are denied.

15.     In answer to paragraph 15 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 15 of the Complaint, and based thereon deny such allegations.

16.     In answer to paragraph 16 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 16 of the Complaint, and based thereon deny such allegations.

17.     Defendants admit to the allegations stated in paragraph 17 of the Complaint.

18.     In answer to paragraph 18 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 18 of the Complaint, and based thereon deny such allegations.

19.     In answer to paragraph 19 of the Complaint, Defendants admit that a third party made a cash bid of approximately $3.9 million at the trustee's sale held on September 8, 2011. However, Defendants lack knowledge or information sufficient to admit or deny whether the third party's bid was a result of "active contested bidding," and based thereon deny such allegations.

20.     In answer to paragraph 20 of the Complaint, Defendants deny each and every

allegation contained therein.

21.    Defendants answer paragraph 21 of the Complaint as follows:

a.    Defendants lack knowledge or information sufficient to admit or deny whether the total amounts outstanding under the Promissory Note were $4,519,630.65, and based thereon deny such allegations.

b.    Defendants deny that Plaintiff is entitled to a deficiency based on the difference between the outstanding amounts and the sale price of the property.

c.    Defendants lack knowledge or information sufficient to admit or deny the actual amounts of any alleged "deficiency balance," and based thereon deny such allegations.

d.    Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff has accrued, and continues to accrue, attorneys' fees and costs, and whether these fees and costs are "due," and based thereon deny such allegations.

## The Second Deed of Trust

22.    In answer to paragraph 22 of the Complaint, Defendants admit that they entered into the Line of Credit agreement.

23.    In answer to paragraph 23 of the Complaint, Defendants admit that they executed the Second Deed of Trust.  Defendants lack knowledge or information sufficient to admit or deny the balance of the allegations contained in paragraph 23 of the Complaint, and based thereon deny such allegations.

24.    In answer to paragraph 24 of the Complaint, Defendants admit that the Second Deed of Trust was recorded on April 2, 2001, as instrument number 546232.  However, Defendants lack knowledge or information sufficient to admit or deny whether the recordation was "proper," and based thereon deny such allegations.

25.     In answer to paragraph 25 of the Complaint, Defendants admit that they entered into the Line of Credit Modification.

26.     In answer to paragraph 26 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 26 of the Complaint, and based thereon deny such allegations.

27.     In answer to paragraph 27of the Complaint, the allegations state legal conclusions to which no responsive pleading is required.  Insofar as a responsive pleading is required as to any of the allegations stated in paragraph 27of the Complaint, they are denied.

28.     In answer to paragraph 28 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 28 of the Complaint, and based thereon deny such allegations.

29.     In answer to paragraph 29 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 29 of the Complaint, and based thereon deny such allegations.

30.     Defendants admit to the allegations stated in paragraph 30 of the Complaint.

31.     In answer to paragraph 31 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 30 of the Complaint, and based thereon deny such allegations.

32.     In answer to paragraph 32 of the Complaint, Defendants admit that Plaintiff made a credit bid in the amount of $10,000.00.  However, Defendants lack knowledge or information sufficient to admit or deny whether the Second Deed of Trust became a "sold-out junior loan following subsequent foreclosure of the First Deed of Trust," and based thereon deny such allegations.

33.     In answer to paragraph 33 of the Complaint, Defendants lack knowledge or information sufficient to admit or deny the allegations stated in paragraph 33 of the Complaint, and based thereon deny such allegations.

34.     In answer to paragraph 34 of the Complaint, Defendants deny each and every allegation contained therein.

35.     Defendants answer paragraph 35 of the Complaint as follows:

a.     Defendants lack knowledge or information sufficient to admit or deny whether the total amounts outstanding under the Promissory Note were $1,308,237.60, and based thereon deny such allegations

b.     Defendants deny that Plaintiff is entitled to a deficiency based on the difference between the outstanding amounts and the sale price of the property.

c.     Defendants lack knowledge or information sufficient to admit or deny the actual amounts of any alleged "deficiency balance," and based thereon deny such allegations.

d.     Defendants lack knowledge or information sufficient to admit or deny whether Plaintiff has accrued, and continues to accrue, attorneys' fees and costs, and whether these fees and costs are "due," and based thereon deny such allegations.

## COUNT ONE

## DEFICIENCY JUDGMENT ON FIRST DEED OF TRUST

36.     In answer to paragraph 36 of the Complaint, Defendants reallege and incorporate by reference each preceding paragraph of this Answer.

37.     In answer to paragraph 37 of the Complaint, Defendants admit that Idaho Code section 45-1512 permits a beneficiary under a dead of trust to sue for a deficiency judgment, but that Section 45-1512 further provides that the judgment cannot be for "more than the amount by

which the entire amount of indebtedness due at the time of sale exceeds the fair market value at that time, with interest from date of sale, but in no event may the judgment exceed the difference between the amount for which such property was sold and the entire amount of the indebtedness secured by the deed of trust."

38.     In answer to paragraph 38 of the Complaint, Defendants deny each and every allegation contained therein.

39.     In answer to paragraph 39 of the Complaint, Defendants deny each and every allegation contained therein.

## COUNT TWO

## DEFICIENCY JUDGMENT ON SECOND DEED OF TRUST

40.     In answer to paragraph 40 of the Complaint, Defendants reallege and incorporate by reference each preceding paragraph of this Answer.

41.     In answer to paragraph 41 of the Complaint, Defendants admit that Idaho Code section 45-1512 permits a beneficiary under a dead of trust to sue for a deficiency judgment, but that Section 45-1512 further provides that the judgment cannot be for "more than the amount by which the entire amount of indebtedness due at the time of sale exceeds the fair market value at that time, with interest from date of sale, but in no event may the judgment exceed the difference between the amount for which such property was sold and the entire amount of the indebtedness secured by the deed of trust."

42.     In answer to paragraph 42 of the Complaint, Defendants deny each and every allegation contained therein.

43.     In answer to paragraph 43 of the Complaint, Defendants deny each and every allegation contained therein.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by the applicable statute(s) of limitations.

### THIRD AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by waiver.

### FOURTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by equitable estoppel.

### FIFTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred or reduced by set off because of common law and statutory violations by BOA.

### SIXTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred or reduced by recoupment because of common law and statutory violations by BOA.

### SEVENTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by Plaintiff's unclean hands.

### EIGHTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred because any and all acts and/or omissions by Defendants, if any, were based upon legally sufficient justification.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages in the Complaint, if any, were aggravated by Plaintiff's failure to use reasonable diligence to mitigate them.

## TENTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are discharged by operation of law and/or by virtue of Plaintiff's conduct.

## ELEVENTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by Plaintiff's breach of the agreements that are the subject of the Complaint.

## TWELFTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by Plaintiff's fraud, including, but not limited to, Plaintiff's failure to disclose material facts.

## THIRTEENTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred by a Third Parties' fraud, including, but not limited to, a Third Parties' failure to disclose material facts.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendants presently have insufficient knowledge of information on which to form a basis as to whether they may have additional, as yet unstated, defenses available to them. Based thereon, Defendants reserve the right to assert additional defenses in the event facts subsequently become known to the Defendants which suggest that such additional defenses would be appropriate.

WHEREFORE, Defendants pray for judgment as follows:

A.     That Plaintiff take nothing by way of the Complaint;

B.     That Defendants be awarded their costs of suit incurred herein; and

C.     That Defendants be awarded such other and further relief as the Court may deem just and proper.

## COUNTERCLAIMS

COMES NOW the Defendants and Counterclaimants, Lee P. Enright and Nancy K. Enright (collectively, "Enrights" or "Counterclaimants"), for themselves, and allege as follows with respect to their Counterclaims against Plaintiff and Counterdefendant Bank of America, N.A. ("BOA") and now joins Counterdefendant Merrill Lynch, Pierce, Fenner and Smith, Inc., as successor by merger to Banc of America Investment Services, Inc, (collectively "Counterdefendants") as follows:

### JOINED COUNTERDEFENDANTS

1.    Counterdefendant Merrill Lynch, Pierce, Fenner and Smith, Inc., as successor by merger to Banc of America Investment Services, Inc. (wholly referred to herein as "Merrill Lynch") is hereby joined as a Counterdefendant pursuant to Federal Rule of Civil Procedure 19 on the grounds that joinder is required for the granting of complete relief in the determination of the Counterclaims asserted herein.  Merrill Lynch, Pierce, Fenner and Smith, Inc. is a corporation organized under the laws of the State of Delaware doing business in the State of Idaho and may be served with process through either its registered agent CT Corporation System at 1111 West Jefferson, Suite 530, Boise, Idaho 83702 or through Banc of America Investment Services, Inc.'s authorized agent for process after merger, Bank of America NA Legal Processing Department at 5701 Horatio Street, Utica, New York 13502-1024.  On information and belief, Merrill Lynch, Pierce, Fenner and Smith, Inc. is a separate entity which is a non-bank subsidiary of Counterdefendant Bank of America, N.A.

### FACTUAL ALLEGATIONS

2.    Lee P. Enright was a cardiac surgeon who performed over ten thousand cardiac procedures during his career.  In or around 1991, Dr. Enright retired due, in part, to a disability

that rendered him unable to work. After retiring, the Enrights moved from California to Idaho, and purchased a home located at 85 Eagle Creek Road, Ketchum, Idaho 83340 (the "Idaho Property").

3.      In or around 2006, the Enrights decided to return to California and purchase a smaller and more manageable home located at 5125 Happy Canyon, Santa Ynez, California 93460 (the "Santa Ynez Property"). At the time, the Enrights had liquid assets totaling approximately $3 million. However, a substantial portion of these liquid assets consisted of Dr. Enright's Individual Retirement Account ("IRA") funds. In fact, the Enrights had no real source of income, other than the distributions from Dr. Enright's IRA.

4.      On or around June 1, 2006, the Enrights approached their bank, BOA, to inquire about how they could finance the purchase of the Santa Ynez Property. The Enrights originally listed the Idaho Property for sale on September 9, 2005. However, the Enrights were unsure how and if they could obtain financing to purchase the Santa Ynez Property and therefore sought advice from BOA.

5.      BOA serviced the Enrights' business through its subsidiary, Banc of America Investment Services, Inc. ("BOAIS"), which is a non-bank entity that provides wealth management and investment services to its clients.

6.      At all times mentioned herein and prior to its merger with Merrill Lynch, Pierce, Fenner and Smith, Inc. in late 2009, BOAIS was a FINRA registered brokerage firm and an investment adviser firm, and according to FINRA, was registered as engaging in non-securities business including, but not limited to, offering financial planning services. Attached hereto as Exhibit 1 and incorporated for all purposes is a copy of the first eleven (11) pages of a FINRA BrokerCheck Report for BOAIS dated July 25, 2012.

7.     The person handling the Enrights' business with BOAIS and BOA was Robert Corker, a Senior Vice President for BOAIS and a division of BOAIS and BOA, U.S. Trust, Bank of America Private Wealth Management Division.  Mr. Corker made these representations to the Enrights on his email signature that he sent to the Enrights.  Included as Exhibit 2 hereto and incorporated for all purposes is an email that Mr. Corker sent to the Enrights on or about June 17, 2008.

8.     Mr. Corker was the Enrights' client relationship manager or "wealth consultant". Individually and as part of BOAIS, Mr. Corker was also a FINRA registered broker, holding FINRA Series 6, 7, 63, and 66 licenses.  Attached hereto as Exhibit 3 and incorporated for all purposes is a copy of a FINRA BrokerCheck Report for Mr. Corker dated July 25, 2012 which includes Mr. Corker's registration history.  In addition, Mr. Corker was a registered Investment Advisor Representative with BOAIS from March 5, 2003 until March 6, 2009, when his employment with BOAIS and BOA was terminated.  Attached hereto as Exhibit 4 and incorporated for all purposes is a copy of a SEC Investment Advisor Representative Public Disclosure Report dated July 25, 2012 for Mr. Corker.

9.     Mr. Corker's duties at BOAIS included partnering with other specialists within BOA's network or subsidiaries and divisions, including the investment units, the brokerage units, and the loan units to help deliver services to his clients, including the Enrights, to ensure that their financial goals could be achieved.  These services included deposit accounts, commercial and residential loans, brokerage accounts and investment accounts, including individual investments.  At no time was Mr. Corker engaged in or represented the consumer loan division of BOA or had any loan authority.

10.     At all times mentioned herein up and until March 2009, Mr. Corker was

employed by BOAIS and/or BOA and operated in the scope of his employment with BOAIS and/or BOA.

11.     During the initial meeting with Mr. Corker, the Enrights informed him that: (1) they had been retired for approximately fifteen years; (2) they were currently not employed in any capacity; (3) Dr. Enright could no longer work as a surgeon due to disability; and (4) they had no source of income other than distributions from Dr. Enright's IRA.

12.     At all times that the Enrights consulted with and sought Mr. Corker's advice, Mr. Corker was a FINRA registered broker and investment advisor representative holding multiple series licenses.  Because of Mr. Corker's qualifications, there was no need for either Mr. Corker or BOAIS to refer the Enrights to a separate and independent financial advisor or deny their request for financial advice.  Mr. Corker and BOAIS, as the Enrights' wealth managers, were well qualified to give their professional opinion regarding the feasibility of the plan regarding the purchase of the Santa Ynez Property and the financing that the Enrights should incur.  Accordingly, Mr. Corker consulted with and advised the Enrights to finance the purchase of the Santa Ynez Property by taking out a series of loans from BOA.

13.     Mr. Corker acted as the Enrigths' trusted agent to advance the Enrigths' interests in achieving their financial and real estate goals as well as the agent of BOAIS and BOA to advance the interest of BOA to obtain profit from the Enrights.  Mr. Corker had a professional and economic incentive to not only help the Enrights achieve their goals, but also a professional and economic incentive to ensure that BOAIS, and thereby BOA, profit from the Enrigths' business.

14.     Throughout all of the consultations that Mr. Corker had with the Enrights, Mr. Corker never disclosed to the Enrights (1) his conflicting role as the Enrights' agent and as an

agent of BOAIS, "U.S. Trust, Bank of America Private Wealth Management", and by virtue of such agency, an agent for BOA, (2) the relationship that BOAIS and the "U.S. Trust, Bank of America Private Wealth Management" had with BOA, and/or (3) the sales goals or other compensation that incentivized him to procure the Enrights' business through his relationship with the Enrights.

15.　　To effectuate the Enrights' goals, Mr. Corker told the Enrights that they could easily qualify for loans through BOA because Dr. Enright's IRA funds would increase the Enrights' net worth, which was a factor in determining eligibility for a loan through BOA.

16.　　At the time the foregoing representations were made, Mr. Corker, through his qualifications as a broker and an investment advisor representative, either knew or should have known that IRA funds are considered "protected," and cannot be used to calculate "net worth," when determining an individual's eligibility for a loan.

17.　　The Enrights informed Mr. Corker that they were unsure whether they should enter into a loan because they had no income and were currently unemployable, even if they technically qualified for a loan through BOA. Despite these concerns, Mr. Corker still recommended that the Enrights finance the purchase of the Santa Ynez Property through loans obtained from BOA.

18.　　Mr. Corker advised the Enrights to use the proceeds of the sale of the Idaho Property to repay any loans they obtained through BOA, after the Enrights disclosed that they lacked a source of income. Mr. Corker also assured the Enrights that the Idaho Property could be sold in two years at most, prior to maturity of any loans.

19.　　At the time the foregoing representations were made, and up until September 2010, BOA never had the Idaho Property appraised to verify whether it could be sold within two

years, or whether the actual sale proceeds would be sufficient to repay the loans in full. Additionally, BOA never assessed the market for salability; never hired a real estate consultant to assist in establishing a timeline for the sale of the Idaho Property; and never lent the Enrights any assistance the securing a buyer for the Idaho Property.

20.    In reliance upon BOA's advice, as outlined herein, the Enrights took out three loans from BOA that were secured by deeds of trust on the Idaho Property and the Santa Ynez Property (collectively referred to as the "Notes").

21.    On or around June 28, 2006, the Enrights executed a promissory note in favor of BOA for the original principal amount of $3 million (the "First Note").  As security for the First Note, the Enrights granted BOA a deed of trust on the Santa Ynez Property (the "Santa Ynez DOT"), which was recorded on or around June 30, 2006.

22.    On or around July 7, 2006, the Enrights executed a promissory note in favor of BOA for the original principal amount of $3.9 million (the "Second Note").  As security for the Second Note, the Enrights granted BOA a deed of trust on the Idaho Property (the "Idaho DOT"), which was recorded on or around July 12, 2006.

23.    The terms of the Second Note required the Enrights to only pay interest for the period beginning on August 12, 2006 and ending on June 12, 2009.  After that, the Enrights were required to pay the entire principal balance plus accrued interest on or before July 12, 2009, the maturity date of the Second Note.  These terms were in conformity with BOA's recommendation that the Enrights repay their loans through a sale of the Idaho Property, prior to maturity.

24.    In or around July 2006, the Enrights entered into an "Equity Maximizer Agreement and Disclosure Statement," in order to obtain a $1 million line of credit from BOA (the "LOC").  Mr. Corker advised the Enrights to take out the LOC so they could use the

proceeds to pay interest on the each of the Notes. This also conformed to Mr. Corker's suggestion that the Notes could be paid off with the proceeds from the sale of the Idaho Property. The LOC was also secured by a second deed of trust on the Idaho Property, recorded on July 12, 2006 (the "LOC DOT").

25.     On or around November 15, 2007, the Enrights entered into a "Real Estate Line of Credit Modification" Agreement with BOA, which increased the LOC to $1.25 million. The Enrights requested this additional extension of credit so that they could continue making interest payments on the Notes, pending a sale of the Idaho Property, pursuant to BOA's advice.

26.     The Enrights soon depleted the proceeds of the $1.25 million LOC by making interest-only payments on the Notes, as BOA recommended. Because of this, the Enrights requested an additional extension of credit from BOA.

27.     On or around May 1, 2008, Mr. Corker informed the Enrights that BOA had denied their request for an additional extension of credit. The Enrights informed Mr. Corker that they could not continue making interest payments on the Notes without an additional extension of credit because they had no real income. The Enrights also reminded Mr. Corker that he had advised them to take out the three BOA loans, despite their lack of income, because the loans could be repaid within two years from the proceeds of the sale of the Idaho Property.

28.     Instead of granting the Enrights an additional extension of credit, Mr. Corker advised the Enrights to use Dr. Enright's IRA funds to make payments on the Notes. Mr. Corker also threatened the Enrights by telling them that unless they made payments from Dr. Enright's IRA funds, they would "be in default and the foreclosure process could only yield 'pennies on the dollar.'" The Enrights followed Mr. Corker's advice and began making payments using Dr. Enright's IRA funds.

29.     As outlined herein, the Enrights listed the Idaho Property for sale, with an original asking price of $17.2 million, on or around September 9, 2005.  The Enrights were certain that they could sell the Idaho Property and repay their loans within two years at most, based on the representations made by BOA.

30.     During the time the Enrights listed the Idaho Property for sale, they also continued to make interest payments on the Notes, using IRA funds, as recommended by Mr. Corker.  The Enrights completely decimated their IRA during their attempts to stay current. Despite their best efforts, the Enrights were forced to default on the Second Note and LOC in or around 2009.

31.     Additionally, the Enrights were unable to sell the Idaho Property, despite repeated assurances from BOA that they would be able to do so within a two-year timeframe.  Because of this, the Enrights reduced the asking price on the Idaho Property incrementally from $17.2 million to $7.19 million.  Contrary to BOA's assurances that the Idaho Property would be sold within two years, the Idaho Property was on the market for almost five years at the time the Enrights were in default of the Second Note and LOC.

32.     In or around March 2010, the Enrights received two separate offers to purchase the Idaho Property.  One of those offers was from an entity called "AC & CE," for approximately $5.25 million.  The other offer was from an individual named David Wiel.  The Enrights intended to accept either AC & CE's offer or Mr. Wiel's offer.  However, BOA delayed in approving the Enrights' acceptance of these offers.  As a result, both offers were subsequently withdrawn.

33.     On February 15, 2011, BOA recorded two notices of default on the Second Note and LOC (the "Notices of Default").  The Notices of Default set a trustee's sale of the Idaho

Property for June 21, 2011.

34.     The Enrights were forced to deplete Dr. Enright's IRA funds in order to make

payments on the Second Note, pursuant to BOA's advice.  When they were no longer able to

make payments, the faced foreclosure of their home.  As a result of their dire financial

circumstances, the Enrights were forced to file for Chapter 11 Bankruptcy on May 6, 2011.  As

of the date of the Enrights' Chapter 11 filing, the Idaho Property remained unsold for

approximately five years.

35.     On or around June 30, 2011, BOA filed a motion for relief from the automatic

stay that was in place.  BOA argued, *inter alia*, that they should be allowed to foreclose on the

Idaho Property because the Enrights could not sell it for enough money to generate proceeds for

their bankruptcy estate.  In support of their motion, BOA's attorneys declared, under penalty of

perjury, that there had only been one single offer on the Idaho Property.  This was a blatant

misrepresentation, as evidenced by the two additional March 2010 offers, which included AC &

CE's $5.25 million offer.

36.     On July 26, 2011, the Enrights agreed to allow BOA relief from stay.

Accordingly, the Bankruptcy Court granted BOA's motion for relief from the automatic stay,

thus allowing BOA to pursue all available non-judicial remedies, including a trustee's sale of the

Idaho Property.

37.     On September 9, 2011, BOA foreclosed on the Second Note and sold the Idaho

Property at a trustee's sale (the "Trustee's Sale") to AC & CE for approximately $3.9 million.

This was the same entity that made the $5.25 million offer in March 2010.  AC & CE acquired

the Idaho Property at a $1.35 million discount, because of BOA's delay tactics.  A Trustee's

Deed was recorded on September 9, 2011, conveying the Idaho Property to AC & CE.

38.     As a result of their reliance on BOA's representations and financial advice, as outlined herein, the Enrights have suffered substantial losses, in an amount to be proven at trial. The Enrights have no source of income in retirement.  They are no longer able to work.  They have also depleted Dr. Enright's IRA funds, after following BOA's recommendation to use those funds to make payments.  In addition to losing the Idaho Property, the Enrights now also face liability for an alleged $1.9 million deficiency.

## FIRST COUNTERCLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

39.     Counterclaimants reallege and incorporate herein by reference each and every allegation contained in each preceding paragraph, as though fully incorporated herein and made a part hereof.

40.     At all times mentioned herein, a fiduciary relationship existed between the Enrights and BOA and BOAIS, by and through Mr. Corker, as a FINRA registered broker and investment advisor representative, acted as the Enright's financial advisor, as outlined herein. BOA and BOAIS's conduct includes, but is not limited to, the following:

    a.     Routinely providing financial advice and consulting to the Enrights.

    b.     Advising the Enrights to enter into the First Note, Second Note, and LOC in order to finance their purchase of the Santa Ynez Property.

    c.     Advising the Enrights that they qualified for BOA loans by virtue of Dr. Enright's IRA funds.

    d.     Advising the Enrights that they could repay the Notes by selling the Idaho Property.

    e.     Advising the Enrights that the Idaho Property could be sold in two years.

f.       Advising the Enrights to use IRA funds to make payments on the Notes.

g.       Acting on behalf of the Enrights in a dual agent capacity as their wealth relationship manager.

41.     As a result of their fiduciary relationship, BOA and BOAIS had a fiduciary duty to act in the utmost good faith and in the best interests of the Enrights.

42.     BOA and BOAIS breached its fiduciary duties to the Enrights by its wrongful acts and omissions, including, but not limited to:

a.        Advising the Enrights to enter into the First Note, Second Note, and LOC even though it knew that the Enrights were not employed and could not generate sufficient income to make payments on the loans.

b.       Advising the Enrights that they qualified for BOA loans by virtue of Dr. Enright's IRA funds.

c.       Advising the Enrights that they could repay the Notes by selling the Idaho Property, and that such sale would occur before the loans matured.

d.       Advising the Enrights that the Idaho Property could be sold within two years without appraising it; assessing the market for salability; hiring any real estate professionals to establish a sale timeline; or assisting the Enrights in acquiring a buyer within a two-year timeframe.

e.       Threatening to foreclose on the Idaho Property if the Enrights did not make payments on the Notes with Dr. Enright's IRA funds.

f.       Misrepresenting the amount of offers on the Idaho Property in an attempt to obtain relief from the bankruptcy stay so it could foreclose on the Idaho Property.

g.       Delaying in approving the sale of the Idaho Property to AC & CE in or

around March 2010 for approximately $5.25, as well as another prospective buyer, David Wiel, and subsequently selling the Idaho Property to AC & CE for $3.9 million.

43.     As a direct and proximate result of the above-mentioned breaches of BOA and BOAIS's fiduciary duties, the Enrights are entitled to a judgment against Counterdefendants for damages.  The Enrights' damages include, but are not limited to, compensatory relief in such amounts as shall be proven at trial.  In addition, Counterclaimants are entitled to recover costs of this suit, including reasonable attorneys' fees.

44.     Counterclaimants reserve this paragraph for the inclusion of a claim for punitive damages under Idaho Code section 6-1604.

## SECOND COUNTERCLAIM FOR RELIEF

## CONSTRUCTIVE FRAUD

45.     Counterclaimants reallege and incorporate herein by reference each and every allegation contained in each preceding paragraph, as though fully incorporated herein and made a part hereof.

46.     At all times mentioned herein, a fiduciary relationship existed between the Enrights and BOA and BOAIS, by and through Mr. Corker, as a FINRA registered broker and investment advisor representative, acted as the Enright's financial advisor, as outlined herein. BOA and BOAIS's conduct includes, but is not limited to, the following:

    a.     Routinely providing financial advice and consulting to the Enrights.

    b.     Advising the Enrights to enter into the First Note, Second Note, and LOC in order to finance their purchase of the Santa Ynez Property.

    c.     Advising the Enrights that they qualified for BOA loans by virtue of Dr. Enright's IRA funds.

d.     Advising the Enrights that they could repay the Notes by selling the Idaho Property.

e.     Advising the Enrights that the Idaho Property could be sold in two years.

f.     Advising the Enrights to use IRA funds to make payments on the Notes.

g.     Acting on behalf of the Enrights in a dual agent capacity as their wealth relationship manager.

47.     As a result of their fiduciary relationship, BOA and BOAIS had a fiduciary duty to act in the utmost good faith and in the best interests of the Enrights.

48.     BOA and BOAIS breached its fiduciary duties to the Enrights by its wrongful acts and omissions, including, but not limited to:

a.     Advising the Enrights to enter into the First Note, Second Note, and LOC even though it knew that the Enrights were not employed and could not generate sufficient income to make payments on the loans.

b.     Advising the Enrights that they qualified for BOA loans by virtue of Dr. Enright's IRA funds.

c.     Advising the Enrights that they could repay the Notes by selling the Idaho Property, and that such sale would occur before the loans matured.

d.     Advising the Enrights that the Idaho Property could be sold within two years without appraising it; assessing the market for salability; hiring any real estate professionals to establish a sale timeline; or assisting the Enrights in acquiring a buyer within a two-year timeframe.

e.     Threatening to foreclose on the Idaho Property if the Enrights did not make payments on the Notes with Dr. Enright's IRA funds.

f.      Misrepresenting the amount of offers on the Idaho Property in an attempt to obtain relief from the bankruptcy stay so it could foreclose on the Idaho Property.

g.      Delaying in approving the sale of the Idaho Property to AC & CE in or around March 2010 for approximately $5.25, as well as another prospective buyer, David Wiel, and subsequently selling the Idaho Property to AC & CE for $3.9 million.

49.     The Enrights acted in reliance upon BOA and BOAIS's advice and representations by, *inter alia*, executing the First Note, the Second Note, the LOC in favor of BOA and BOAIS, and making payments on the Notes out of their IRA funds.  Had the Enrights known that BOA and BOAIS was giving them false and misleading financial advice, they would have not executed the loan documents, nor continued making payments out of IRA funds thereto.

50.     The Enrights were justified in relying upon BOA and BOAIS's representations and advice, and such reliance was reasonable because BOA, through BOAIS and Mr. Corker, held themselves out as experienced financial advisor, registered with FINRA.

51.     As a result of BOA and BOAIS's wrongful acts and omissions, BOA and BOAIS gained an unfair advantage over the Enrights, and was able to induce them to execute the First Note, the Second Note, and the LOC, make payments out of their IRA funds, and subsequently foreclose on the Idaho Property.

52.     As a direct and proximate result of BOA and BOAIS's wrongful conduct, the Enrights are entitled to a judgment against Counterdefendants for damages.  The Enrights' damages include, but are not limited to, compensatory relief in such amounts as shall be proven at trial.  In addition, Counterclaimants are entitled to recover costs of this suit, including reasonable attorneys' fees.

53.     Counterclaimants reserve this paragraph for the inclusion of a claim for punitive

damages under Idaho Code section 6-1604.

<strong>THIRD COUNTERCLAIM FOR RELIEF</strong>

<strong>INTENTIONAL MISREPRESENTATION</strong>

54.     Counterclaimants reallege and incorporate herein by reference each and every allegation contained in each preceding paragraph, as though fully incorporated herein and made a part hereof.

55.     As alleged herein, BOA and BOAIS made numerous misrepresentations to the Enrights, including, but not limited to:

a.     Informing the Enrights that they qualified for the First Note, the Second Note, and the LOC, even though the Enrights had no real source of income other than the IRA funds;

b.     Informing the Enrights that they could repay their loans through the proceeds from a sale of the Idaho Property, and that such sale would occur within two years;

c.     Threatening to foreclose on the Idaho Property if the Enrights did not make payments on the Notes with their IRA funds.

56.     BOA and BOAIS knew that the forgoing representations were false when it made them to the Enrights and/or made the representations recklessly and without regard for their truth.

57.     BOA and BOAIS made the foregoing misrepresentations with the intent to induce the Enrights to act in reliance on them.

58.     The Enrights acted in reliance upon BOA and BOAIS's misrepresentations by, *inter alia*, executing the First Note, the Second Note, the LOC in favor of BOA, and making payments on the Notes out of their IRA funds.  Had the Enrights known that the foregoing

representations were false, they would have not executed the loan documents, nor continued making payments out of IRA funds thereto.

59.     The Enrights were justified in relying upon BOA and BOAIS's representations and advice, and such reliance was reasonable because BOA, through BOAIS and Mr. Corker, held themselves out as experienced financial advisor, registered with FINRA.

60.     As a direct and proximate result of BOA and BOAIS's intentional misrepresentations, the Enrights are entitled to a judgment against Counterdefendants for damages.  The Enrights' damages include, but are not limited to, compensatory relief in such amounts as shall be proven at trial.  In addition, Counterclaimants are entitled to recover costs of this suit, including reasonable attorneys' fees.

61.     Counterclaimants reserve this paragraph for the inclusion of a claim for punitive damages under Idaho Code section 6-1604.

## FOURTH COUNTERCLAIM FOR RELIEF

## FRUAD – FAILURE TO DISCLOSE

62.     Counterclaimants reallege and incorporate herein by reference each and every allegation contained in each preceding paragraph, as though fully incorporated herein and made a part hereof.

63.      At all times mentioned herein, a fiduciary relationship existed between the Enrights and BOA and BOAIS, by and through Mr. Corker, as a FINRA registered broker and investment advisor representative, acted as the Enright's financial advisor, as outlined herein. BOA and BOAIS's conduct includes, but is not limited to, the following:

    a.     Routinely providing financial advice and consulting to the Enrights.

    b.     Advising the Enrights to enter into the First Note, Second Note, and LOC

in order to finance their purchase of the Santa Ynez Property.

        c.      Advising the Enrights that they qualified for BOA loans by virtue of Dr. Enright's IRA funds.

        d.      Advising the Enrights that they could repay the Notes by selling the Idaho Property.

        e.      Advising the Enrights that the Idaho Property could be sold in two years.

        f.      Advising the Enrights to use IRA funds to make payments on the Notes.

        g.      Acting on behalf of the Enrights in a dual agent capacity as their wealth relationship manager.

64.     As a result of their fiduciary relationship, BOA and BOAIS, through their employee, Mr. Corker, the Enrights' trusted advisor and wealth relationship manager, had a duty to disclose all issues of material fact to Counterclaimants.

65.     BOA and BOAIS, through their employee, Mr. Corker, the Enrights' trusted advisor and wealth relationship manager, failed to disclose the following issues of material fact, all to the detriment of Counterclaimants:

        a.      Mr. Corker's conflicting role as a "dual agent": an wealth management agent for Enrights to achieve their financial and real estate goals and as a FINRA registered broker and investment advisor representative for BOA and BOAIS for the benefit of BOA and BOAIS. Mr. Corker continually worked on behalf of the Enrigths to procure the loans and deals for the Enrights with certain departments, units, and/or divisions in BOA, including, but not limited to, loan underwriters in this dual agent capacity, however, never disclosed that he was the agent of both the Enrigths and BOA and BOAIS.

        b.      The relationship that BOAIS and/or "U.S. Trust, Bank of America Private

Wealth Management" had with BOA and how that affected the Enrights' relationship with BOA and BOAIS.

        c.     The sales goals, economic interests, other compensation arrangements that incentivized Mr. Corker and/or BOAIS to procure the Enrights' business through Mr. Corker's relationship with the Enrights for the benefit of BOAIS and/or BOA.

        d.     Mr. Corker's, and thereby BOAIS's, failure to fully and adequately advise the Enrights concerning their risk level in the proposed loan structure to help BOA and BOAIS profit from the Enrights' business.

        66.     As a direct and proximate result of BOA and BOAIS's failure to disclose, the Enrights are entitled to a judgment against Counterdefendants for damages. The Enrights' damages include, but are not limited to, compensatory relief in such amounts as shall be proven at trial. In addition, Counterclaimants are entitled to recover costs of this suit, including reasonable attorneys' fees.

        67.     Counterclaimants reserve this paragraph for the inclusion of a claim for punitive damages under Idaho Code section 6-1604.

**FIFTH COUNTERCLAIM FOR RELIEF**

**BREACH OF CONTRACT - BREACH OF COVENANT OF**

**GOOD FAITH AND FAIR DEALING**

        68.     Counterclaimants reallege and incorporate herein by reference each and every allegation contained in each preceding paragraph, as though fully incorporated herein and made a part hereof.

        69.     Each loan agreement specified herein between the Enrights and BOA is a contract which contained an implied covenant of good faith and fair dealing.

70.     BOA breached these covenants of good faith and fair dealing by:

a.      Informing, through BOAIS and Mr. Corker, the Enrights that they qualified for the First Note, the Second Note, and the LOC, even though the Enrights had no real source of income other than the IRA funds;

b.      Informing, through BOAIS and Mr. Corker, the Enrights that they could repay their loans through the proceeds from a sale of the Idaho Property, and that such sale would occur within two years, with no regard to the value of the property, and then intentionally delaying in accepting the offers made on the Idaho Property, as described herein, to satisfy this requirement and assertion;

c.      Threatening to foreclose on the Idaho Property if the Enrights did not make payments on the Notes with their IRA funds, knowing full well that Enrights had no real source of income for living expenses other than the IRA funds;

d.      Giving Enrights financial advice and acting as financial advisor to the Enrights, through BOAIS and Mr. Corker, without due regard for the Enrights' best financial situation, including advising the Enrights to liquidate their IRA and/or advising the Enrights to accept the Notes on the basis of the IRA; and,

e.      Through BOA and BOAIS, failing to make appropriate disclosures to the Enrights, including their credit worthiness, sacrosanct nature of their IRA, and that it would not be in the Enrights' best interest to accept the Notes as forced upon them by BOA.

71.     The Enrights are informed and believe, and based thereon, allege that BOA engaged in, through BOAIS and on its own volition, a course of conduct to further their own economic interests in direct violation of their obligations to the Enrights under the covenants of good faith and fair dealing.

72.     As a direct and proximate result of BOA's breach of the covenants of good faith and fair dealing, the Enrights are entitled to a judgment against BOA for damages. The Enrights' damages include, but are not limited to, compensatory relief in such amounts as shall be proven at trial. In addition, Counterclaimants are entitled to recover costs of this suit, including reasonable attorneys' fees.

73.     Counterclaimants reserve this paragraph for the inclusion of a claim for punitive damages under Idaho Code section 6-1604.

WHEREFORE, Counterclaimants pray for judgment against Counterdefendants as follows:

1.     For a judgment against BOA awarding damages to Counterclaimants for breach of fiduciary duties;

2.     For an award of reasonable attorneys' fees and costs;

3.     For prejudgment and post judgment interest; and

4.     For such other and further relief as the Court deems just and proper under the circumstances.

CHRISTMAN KELLEY & CLARKE, PC

By: _____
Matthew M. Clarke
Dugan P. Kelley
Kenton S. Brice
Attorneys for Defendants, (*admitted Pro Hac Vice*)

JONES & SWARTZ PLLC

By: _____
Eric Swartz
Bruce Jones
Local Counsel for Defendants

**Exhibit 1**

**BrokerCheck Report**

# BANC OF AMERICA INVESTMENT SERVICES, INC.

CRD# 16361

Report #72531-23538, data current as of Wednesday, July 25, 2012.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Registration and Withdrawal | 2 |
| Firm Profile | 3 - 7 |
| Firm History | 8 |
| Firm Operations | 9 - 57 |
| Disclosure Events | 58 |





# About BrokerCheck®

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



# BANC OF AMERICA INVESTMENT SERVICES, INC.

CRD# 16361

SEC# 8-33805

# Report Summary for this Firm

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Main Office Location

100 FEDERAL ST
HEADQUARTERS
BOSTON, MA 02110

## Mailing Address

101 S. TRYON STREET, 19TH FLOOR
NC1-002-19-44
CHARLOTTE, NC 28255

## Business Telephone Number

980-387-6385

This firm is a brokerage firm and an investment adviser firm. For more information about investment adviser firms, visit the SEC's Investment Adviser Public Disclosure website at:

http://www.adviserinfo.sec.gov

## Firm Profile

This firm is classified as a corporation.

This firm was formed in Florida on 06/14/1984.

Its fiscal year ends in December.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

This brokerage firm is no longer registered with FINRA.

## Disclosure Events

Disclosure events are certain criminal matters, regulatory actions, civil judicial proceedings, and financial matters in which the brokerage firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?  **Yes**

The following types of disclosures were reported:

Regulatory Event

Civil Event

Arbitration

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

# Registration Withdrawal Information

This section provides information relating to the date the brokerage firm ceased doing business and the firm's financial obligations to customers or other brokerage firms.

| | |
|---|---|
| **This firm terminated or withdrew registration on:** | 10/23/2009 |
| **Does this brokerage firm owe any money or securities to any customer or brokerage firm?** | Yes |
| **Number of customers owed funds or securities:** | 2 |
| **Amount of money owed to customer:** | $0.00 |
| **Amount of money owed to brokerage firm:** | $0.00 |
| **Market value of securities owed to customer:** | $18,758.58 |
| **Market value of securities owed to brokerage firm:** | $0.00 |
| **Payment arrangement:** | WILL TRANSFER SECURITIES TO CUSTOMER ACCOUNT AT NFS |

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

**FINTa**

# Firm Profile

This firm is classified as a corporation.

This firm was formed in Florida on 06/14/1984.

Its fiscal year ends in December.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any other name by which the firm conducts business and where such name is used.

**BANC OF AMERICA INVESTMENT SERVICES, INC.**
**Doing business as BANC OF AMERICA INVESTMENT SERVICES, INC.**

**CRD#** 16361
**SEC#** 8-33805

**Main Office Location**
100 FEDERAL ST
HEADQUARTERS
BOSTON, MA 02110

**Mailing Address**
101 S. TRYON STREET, 19TH FLOOR
NC1-002-19-44
CHARLOTTE, NC 28255

**Business Telephone Number**
980-387-6385

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.



# Firm Profile

This section provides information relating to all direct owners and executive officers of the brokerage firm.

## Direct Owners and Executive Officers

| Legal Name & CRD# (if any): | MERRILL LYNCH & CO., INC. |
| --- | --- |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Position | SHAREHOLDER |
| Position Start Date | 09/2009 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| Legal Name & CRD# (if any): | BENSON, MARK JARRETT<br>1915552 |
| --- | --- |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | PRESIDENT/CEO/DIRECTOR/CHAIRMAN |
| Position Start Date | 03/2009 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| Legal Name & CRD# (if any): | CALL, JOHN SCOTT<br>2815968 |
| --- | --- |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | SVP/CHIEF COMPLIANCE OFFICER/DIRECTOR OF COMPLIANCE |
| Position Start Date | 03/2009 |

FINPA

# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | NEWTH, RONALD JOSEPH |
| | 1454390 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CHIEF OPERATING OFFICER/DIRECTOR |
| Position Start Date | 11/2008 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | OSAKI, ISAAC |
| | 4910551 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CHIEF LEGAL OFFICER |
| Position Start Date | 02/2009 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |
| Legal Name & CRD# (if any): | ROMANO, JOHN GARY |

# Firm Profile

## Direct Owners and Executive Officers (continued)

|  | 50786610 |
|---|---|
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CFO/DIRECTOR |
| Position Start Date | 03/2009 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |

©2012 FINRA. All rights reserved.     Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.



# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| Legal Name & CRD# (if any): | BANK OF AMERICA CORPORATION |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Company through which indirect ownership is established | MERRILL LYNCH & CO., INC. |
| Relationship to Direct Owner | SHAREHOLDER |
| Relationship Established | 01/2009 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | Yes |

FINra

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

## Firm History

This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.



# Firm Operations

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations(SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the registration became effective, and certain information about the firm's SEC registration.

**This firm is no longer registered with FINRA.**

**The firm's registration with FINRA was from 12/23/1985 to 01/04/2010.**

FINMA

**Exhibit 2**

----- Original Message -----
**From:** Corker, Robert
**To:** Nancy Enright
**Sent:** Tuesday, June 17, 2008 1:14 PM
**Subject:** RE: advice

Hi Lee,
Thank you for circling back to me.  I have had many conversations with internal partners about trying to find a way to extend you additional credit.  As I know you are aware, Lee, these are somewhat unprecedented times for residential real estate lending with banks.  Compounding the issues in this particular circumstance, both of the senior credit underwriters who approved this deal structure are no longer with the Bank (both left under good circumstances, I would add).  However, the fact remains that other senior underwriters, in this environment, are not eager to extend additional credit in a circumstance that is understandably tight.
I know that doesn't help you and Nancy at the moment, however.  I have spent the last month or so talking to different people in various credit channels within BofA.  I've looked into trying to increase the home equity line, term out the existing loan, structure a new loan, etc. and as I've alluded, the reception I've gotten is tepid at best.  Of course, there has been no formal decline of any kind.  In fact, what some of the senior credit people are saying is "well, submit the loan request and we'll underwrite it and see what happens."  That, however, is not a ringing endorsement.
I certainly agree and appreciate that we are coming into a better time for home sales here in the Valley.  As we've already discussed, yours is an incredible and unique property and when the right buyer comes along, it certainly will sell.  That said, time is no longer an allay.  It is amazing how quickly three years go by.
I do wish I had more in the way of options, Lee.  I would be happy to discuss things further at your convenience.
Bob


Please note, as of 10/15/07, my new email address is robert.corker@ustrust.com

Bob Corker
Senior Vice President
U.S. Trust, Bank of America Private Wealth Management
311 Main St, PO Box 299
Ketchum, ID  83340
Tel:  208.726.5393
Fax: 208.726.5712


Office of Supervisory Jurisdiction
Banc of America Investment Services, Inc.
800 - 5th Ave, 37th Floor
Seattle, WA  98104
800.371.3152

---

**From:** Nancy Enright [mailto:nancy.enright@gmail.com]
**Sent:** Tuesday, June 17, 2008 11:43 AM

**To:** Corker, Robert
**Subject:** advice

Dear Bob,
As you undoubtedly know we are at the end of our home equity line of credit and close to the end of the Columbia Fund account. Before we begin to draw on other assets I would like to have your final read on the possibility of an increase in the home equity loan which we have previously discussed.
We are encouraged by the realtors high occupancy figures for the valley this summer. Also encouraging is the high amount of attention our property has been receiving on the Sotheby's website. Sue Englemann would be happy to document that "traffic" for you.
I appreciate your continued support and communication.
Look forward to hearing back from you soon.
Sincerely,
Lee Enright

*************************************************************************

Investment products and services may be available through a relationship managed by U.S. Trust, Bank of America Private Wealth Management, or through a relationship with Banc of America Investment Services, Inc.(R) Certain U.S. Trust associates are Registered Representatives of Banc of America Investment Services, Inc. and may assist you with investment products and services provided through Banc of America Investment Services, Inc. and other non-bank investment affiliates.

We want you to know:

Investment products provided by Bank of America or Banc of America Investment Services, Inc. TM

_____

| Are Not FDIC Insured *** May Lose Value *** Are Not Bank Guaranteed |

_____

Banc of America Investment Services, Inc. is a registered broker-dealer, member FINRA and SIPC and a non-bank subsidiary of Bank of America, N.A.

Orders or instructions concerning your accounts sent through email are not accepted by Banc of America Investment Services, Inc. and may not be accepted by Bank of America. Additionally, do not send information you consider confidential via email, instead, please speak to your representative.

The information contained in this e-mail was obtained from sources believed to be reliable; however, the accuracy or completeness of this information is not guaranteed. The delivery of this information should not be considered to be an offer or solicitation of securities. Past performance is no guarantee of future results

........................................................

The intent of this e-mail may be to solicit your interest in doing business with Banc of America Investment Services, Inc. If you do not wish to receive future e-mail communications from Bank of America and its affiliates, including Banc of America Investment Services, Inc., please click on this link and indicate your preferences.

https://www.bankofamerica.com/privacy/

..........................................................

This communication is confidential and intended only for the addressee. If you are not the intended recipient, you may not copy, disclose, or distribute this message to anyone else; any such actions may be unlawful. If you have received this communication in error, please contact the sender of the message to inform him or her of the error.

*************************************************************************

**Exhibit 3**

**BrokerCheck Report**

# ROBERT JOHN CORKER JR

CRD# 1657622

Report #66824-65020, data current as of Wednesday, July 25, 2012.

| **Section Title** | **Page(s)** |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |



## About BrokerCheck®

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources.
For more information about FINRA, visit www.finra.org.


FINRA

# ROBERT J. CORKER JR

CRD# 1657622

Currently employed by and registered with the following FINRA Firm(s):

**WELLS FARGO ADVISORS, LLC**
411 N. MAIN ST.
KETCHUM, ID 83340
CRD# 19616
Registered with this firm since: 01/03/2011

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**

- 5 Self-Regulatory Organizations
- 2 U.S. states and territories

Is this broker currently suspended or inactive with any regulator? **No**

**This broker has passed:**

- 0 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

## Registration History

This broker was previously registered with FINRA at the following brokerage firms:

**WELLS FARGO INVESTMENTS, LLC**
CRD# 10582
KETCHUM, ID
09/2009 - 01/2011

**BANC OF AMERICA INVESTMENT SERVICES, INC.**
CRD# 16361
KETCHUM, ID
03/2003 - 03/2009

**UST FINANCIAL SERVICES CORP.**
CRD# 36881
NEW YORK, NY
03/1995 - 12/1995

## Disclosure Events

Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

Are there events disclosed about this broker? **No**

## Investment Adviser Representative Information

This individual is a broker and an investment adviser representative. For more information about investment adviser representatives, visit the SEC's Investment Adviser Public Disclosure website at : http://www.adviserinfo.sec.gov

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 5 SROs and is licensed in 2 U.S. states and territories through his or her employer.**

## Employment 1 of 1

Firm Name: **WELLS FARGO ADVISORS, LLC**
Main Office Address: **ONE NORTH JEFFERSON AVENUE**
**ST. LOUIS, MO 63103**
Firm CRD#: **19616**

| SRO | Category | Status | Date |
|---|---|---|---|
| FINRA | General Securities Representative | APPROVED | 01/03/2011 |
| NASDAQ OMX PHLX, Inc. | General Securities Representative | APPROVED | 09/30/2011 |
| NASDAQ Stock Market | General Securities Representative | APPROVED | 01/03/2011 |
| NYSE MKT LLC | General Securities Representative | APPROVED | 07/29/2011 |
| New York Stock Exchange | General Securities Representative | APPROVED | 01/24/2011 |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| Idaho | Agent | APPROVED | 01/03/2011 |
| Oregon | Agent | APPROVED | 01/03/2011 |

## Branch Office Locations

**WELLS FARGO ADVISORS, LLC**
411 N. MAIN ST
KETCHUM, ID 83340

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.



# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

This individual has passed 0 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| Investment Company Products/Variable Contracts Representative Examination | Series 6 | 10/27/1994 |
| General Securities Representative Examination | Series 7 | 03/03/2003 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 11/03/1994 |
| Uniform Combined State Law Examination | Series 66 | 12/30/2002 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.





# Registration and Employment History

## Registration History

This broker previously was registered with FINRA at the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 09/2009 - 01/2011 | WELLS FARGO INVESTMENTS, LLC | 10582 | KETCHUM, ID |
| 03/2003 - 03/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | 16361 | KETCHUM, ID |
| 03/1995 - 12/1995 | UST FINANCIAL SERVICES CORP. | 36881 | NEW YORK, NY |
| 04/1987 - 10/1989 | CITICORP FINANCIAL SERVICES, INC. | 14675 | |

## Employment History

Below is the broker's employment history for up to the last 10 years.

**Please note that the broker is required to provide this information only while registered with FINRA and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 01/2011 - Present | WELLS FARGO ADVISORS LLC | KETCHUM, ID |
| 04/2009 - Present | WELLS FARGO BANK, N.A. | KETCHUM, ID |
| 04/2009 - 01/2011 | WELLS FARGO INVESTMENTS, LLC | KETCHUM, ID |
| 10/2002 - 03/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANK OF AMERICA, N.A. | KETCHUM, ID |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

No information reported.

# End of Report

This page is intentionally left blank.

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.



**Exhibit 4**



**Investment Adviser Representative Public Disclosure Report**

# ROBERT JOHN CORKER JR

CRD# 1657622

Report #71663-51060, data current as of Wednesday, July 25, 2012.

| **Section Title** | **Page(s)** |
| --- | --- |
| Report Summary | 1 |
| Qualifications | 2 - 3 |
| Registration and Employment History | 4 |



**IAPD Information about Investment Adviser Representatives**

IAPD offers information on all current-and many former-Investment Adviser Representatives. Investors are strongly encouraged to use IAPD to check the background of Investment Adviser Representatives before deciding to conduct, or continue to conduct, business with them.

- **What is included in a IAPD report?**
  IAPD reports for individual Investment Adviser Representatives include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards.

  It is important to note that the information contained in an IAPD report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the Investment Adviser Representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in IAPD comes from the Investment Adviser Registration Depository (IARD) and FINRA's Central Registration Depository, or CRD®, (see more on CRD below) and is a combination of:

  - information the states require Investment Adviser Representatives and firms to submit as part of the registration and licensing process, and
  - information that state regulators report regarding disciplinary actions or allegations against Investment Adviser Representatives.

- **How current is this information?**
  Generally, Investment Adviser Representatives are required to update their professional and disciplinary information in IARD within 30 days.

- **Need help interpreting this report?**
  For help understanding how to read this report, please consult NASAA's IAPD Tips page http://www.nasaa.org/IAPD/IARReports.cfm.

- **What if I want to check the background of an Individual Broker or Brokerage firm?**
  To check the background of an Individual Broker or Brokerage firm, you can search for the firm or individual in IAPD. If your search is successful, click on the link provided to view the available licensing and registration information in FINRA's BrokerCheck website.

- **Are there other resources I can use to check the background of investment professionals?**
  It is recommended that you learn as much as possible about an individual Investment Adviser Representative or Investment Adviser firm before deciding to work with them. Your state securities regulator can help you research individuals and certain firms doing business in your state. The contact information for state securities regulators can be found on the website of the North American Securities Administrators Association http://www.nasaa.org.


## Investment Adviser Representative Report Summary

# ROBERT JOHN CORKER JR (CRD# 1657622)

The report summary provides an overview of the Investment Adviser Representative's professional background and conduct. The information contained in this report has been provided by the Investment Adviser Representative, investment adviser and/or securities firms, and/or securities regulators as part of the states' investment adviser registration and licensing process. The information contained in this report was last updated by the Investment Adviser Representative, a previous employing firm, or a securities regulator on **09/30/2011.**

## CURRENT EMPLOYERS

**WELLS FARGO ADVISORS, LLC**
IARD# 19616
411 N. MAIN ST.
KETCHUM, ID 83340
Registered with this firm since: 01/03/2011

## QUALIFICATIONS

This Investment Adviser Representative is currently registered in **1** jurisdiction(s).

Is this Investment Adviser Representative currently suspended with any jurisdiction? **No**

**Note:** Not all jurisdictions require IAR registration or may have an exemption from registration.
Additional information including this individual's qualification examinations and professional designations is available in the Detailed Report.

## REGISTRATION HISTORY

This Investment Adviser Representative was previously registered with the following Investment Adviser firms:

| FIRM (IARD#) - LOCATION | REGISTRATION DATES |
|---|---|
| WELLS FARGO INVESTMENTS, LLC (IARD# 10582) - KETCHUM, ID | 09/22/2009 - 01/03/2011 |
| BANC OF AMERICA INVESTMENT SERVICES, INC. (IARD# 16361) - KETCHUM, ID | 03/05/2003 - 03/06/2009 |

For additional registration and employment history details as reported by the individual, refer to the Registration and Employment History section of the Detailed Report.

## DISCLOSURE INFORMATION

Disclosure events include certain criminal charges and convictions, formal investigations and disciplinary actions initiated by regulators, customer disputes and arbitrations, and financial disclosures such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this Investment Adviser Representative?    **No**

## BROKER DEALER INFORMATION

This individual is a broker and an investment adviser representative. For more information about broker individuals, visit FINRA's BrokerCheck website at:http://www.finra.org/brokercheck



# Investment Adviser Representative Qualifications

## REGISTRATIONS

This section provides the states and U.S. territories in which the Investment Adviser Representative is currently registered and licensed, the category of each registration, and the date on which the registration became effective. This section also provides, for each firm with which the Investment Adviser Representative is currently employed, the address of each location where the Investment Adviser Representative works.

This individual is currently registered with **1** jurisdiction(s) through his or her employer(s).

## Employment 1 of 1

| | |
|---|---|
| Firm Name: | **WELLS FARGO ADVISORS, LLC** |
| Main Address: | ONE NORTH JEFFERSON AVENUE<br>H0006-028<br>ST. LOUIS, MO  63103-2205 |
| Firm IARD#: | 19616 |

| U.S. State/ Territory | Status | Date |
|---|---|---|
| Idaho | Approved | 01/03/2011 |

## Branch Office Locations

**WELLS FARGO ADVISORS, LLC**
411 N. MAIN ST.
KETCHUM, ID  83340





# Investment Adviser Representative Qualifications

## PASSED INDUSTRY EXAMS

This section includes all required state securities exams that the Investment Adviser Representative has passed. Under limited circumstances, an Investment Adviser Representative may attain registration after receiving an exam waiver based on a combination of exams the Investment Adviser Representative has passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on an Investment Adviser Representative's specific qualifying work experience. Exam waivers and grandfathering are not included below.

This individual has passed the following exams:

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination (S63) | Series 63 | 11/03/1994 |
| Uniform Combined State Law Examination (S66) | Series 66 | 12/30/2002 |

## PROFESSIONAL DESIGNATIONS

This section details that the Investment Adviser Representative has reported **0** professional designation(s).

No information reported.



# Investment Adviser Representative Registration and Employment History

## PREVIOUSLY REGISTERED WITH THE FOLLOWING INVESTMENT ADVISER FIRMS

This section indicates that state registration records show this Investment Adviser Representative previously held registrations with the following firms:

| Registration Dates | Firm Name | IARD# | Branch Location |
|---|---|---|---|
| 09/22/2009 - 01/03/2011 | WELLS FARGO INVESTMENTS, LLC | 10582 | KETCHUM, ID |
| 03/05/2003 - 03/06/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | 16361 | KETCHUM, ID |

## EMPLOYMENT HISTORY

Below is the Investment Adviser Representative's employment history for up to the last 10 years.

**Please note that the Investment Adviser Representative is required to provide this information only while registered and the information is not updated after the Investment Adviser Representative ceases to be registered, with a state regulator. Therefore, an employment end date of "Present" may not reflect the Investment Adviser Representative's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 01/2011 - Present | WELLS FARGO ADVISORS LLC | KETCHUM, ID |
| 04/2009 - Present | WELLS FARGO BANK, N.A. | KETCHUM, ID |
| 04/2009 - 01/2011 | WELLS FARGO INVESTMENTS, LLC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANK OF AMERICA, N.A. | KETCHUM, ID |

## OTHER BUSINESS ACTIVITIES

This section includes information, if any, as provided by the Investment Adviser Representative regarding other business activities the Investment Adviser Representative is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent, or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious, or fraternal and is recognized as tax exempt.

No information reported.


# End of Report

This page is intentionally left blank.

# Exhibit 2

UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF IDAHO

3    -----------------------------------

4    BANK OF AMERICA, N.A.,              )

5                   Plaintiff,          )  Case No.

6              vs.                      )  1:11-CV-00656-EJL

7    LEE and NANCY K. ENRIGHT,          )

8                   Defendants.         )

9    -----------------------------------

10   LEE and NANCY K. ENRIGHT,          )

11                   Counter-Claimants, )

12              vs.                      )

13   BANK OF AMERICA, N.A.,              )

14                   Counter-Defendants. )

15   -----------------------------------

16

17   DEPOSITION OF ROBERT JOHN CORKER, JR., taken

18   at the AmereicInn of Hailey, in the City of Hailey,

19   State of Idaho, commencing at 9:02 a.m., on July 10,

20   2012, before Roxanne K. Patchell, RPR, CSR, a Notary

21   Public in and for the State of Idaho.

22

23

24   Job No. 149505

25   PAGES 1 - 96

```
 1    APPEARANCES:

 2

 3    FOR BANK OF AMERICA:

 4           Kelly Greene McConnell

 5           GIVENS PURSLEY LLP

 6           601 W Bannock St

 7           PO Box 2720

 8           Boise, ID 83701-2720

 9           Tel:  (208) 388-1200

10           Fax:  (208) 388-1300

11           Kgm@givenspursley.com

12

13    FOR LEE and NANCY K. ENRIGHT:

14           Matthew M. Clarke

15           CHRISTMAN KELLY & CLARKE, PC

16           831 State Street

17           Santa Barbara, CA 93101

18           Tel:  (805) 884-9922

19           Fax:  (866) 611-9852

20           Matt@christmankelley.com

21

22

23

24

25

                                   Page  2
```

```
 1    WITNESS

 2                                              PAGE:

 3    ROBERT JOHN CORKER, JR.

 4         Examination By Mr. Clarke........................    4

 5

 6

 7

 8                                      E X H I B I T S

 9                                              PAGE:
```

```
10    Exhibit 1  E-Mail Chain.................................74

11    Exhibit 2  E-Mail Chain.................................88

12    Exhibit 3  E-Mail Chain.................................90
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

```
1    Hailey, Idaho

2    July 10, 2012

3

4    ROBERT JOHN CORKER, JR.,

5    produced as a witness at the instance of the

6    defendants/counter-claimants, having been first

7    duly sworn, was examined and testified as follows:

8

9    EXAMINATION

10   BY MR. CLARKE:

11        Q.   What is your full name, please.

12        A.   Robert John Corker, Jr.

13        Q.   What is your current employment?

14        A.   I work for Wells Fargo as a private

15   client relationship officer.

16        Q.   Have you done a deposition before?

17        A.   I did when I worked for U.S. Trust

18   Company.  I don't exactly remember what the matter

19   was, but I was deposed once before going back a

20   long time.

21        Q.   Basically what we're here to do is ask

22   you questions and see what information you have.

23        A.   Sure.

24        Q.   I don't want you to guess at anything

25   just to try to provide something to me.
```

Veritext National Deposition & Litigation Services
866 299-5127

1      A.   Okay.

2      Q.   If you have any information on which to

3  give a response, I would like the response.  If

4  you don't have the information on which to give a

5  response, I don't want you to guess.  It's not

6  helpful to me --

7      A.   Okay.

8      Q.   -- we just want information; okay?

9      A.   Okay.  What about if I'm unsure about

10  something that -- I mean, just say that?

11      Q.   Yeah.  Here's an example of what is a

12  pure guess and what's maybe offering an answer

13  based upon information.

14           You see this table in front of us?

15      A.   Yes, sir.

16      Q.   You could probably give me a pretty

17  good estimate of how long it is and how wide it

18  is, correct, just by looking at it.

19      A.   Uh-huh.

20      Q.   Yes?

21      A.   Yes.  Sorry.  Thank you.

22      Q.   That's another one of the tricks we'll

23  get to.

24      A.   No.  No.  That's right.  Yes.

25      Q.   However, if I were to say, "Mr. Corker,

                                    Page 5

```
 1    what are the dimensions of my dining room table?"
 2         A.    I have no idea.
 3         Q.    Yeah, I may not even have one; you
 4    don't know.
 5         A.    Got it.
 6         Q.    So you have no basis on which to offer
 7    any kind of information or response, and you would
 8    just say, "Beats me; I don't know."
 9         A.    Okay.
10         Q.    All right?
11         A.    Yes.
12         Q.    If you do have information that could
13    allow you to respond, I'm entitled to that
14    information.
15         A.    Okay.
16         Q.    But if you don't know something or if
17    you are unsure of something, saying you don't know
18    or saying "I'm unsure" is a legitimate answer;
19    okay?
20         A.    Yes.
21         Q.    The other thing I'll touch on right
22    away is that when I'm speaking, I request that you
23    don't speak.  When are you speaking, I will try
24    not to speak.  If your attorney is speaking, we'll
25    not speak; okay?
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1            A.   Yes.

 2            Q.   Another thing about a deposition is

 3      that the court reporter here has to write

 4      everything down.  And so if we give a thumbs up or

 5      thumbs down or a nod of the head, she can probably

 6      write down what we are doing.

 7                 But sometimes it's ambiguous or a

 8      little vague as to what you are trying to do, so

 9      you need to respond in English audibly so she can

10      hear it; okay?

11            A.   Yes.

12            Q.   And during every-day conversations we

13      always say "uh-huh" and "huh-uh" and nod the head

14      and I'm sure that's going to happen today, but

15      I'll remind you and ask you to respond audibly;

16      okay?

17            A.   Yes.

18            Q.   A deposition is not an endurance

19      contest or a racing -- not racing to the end, so

20      take your time, think about the questions, respond

21      in a useful or intelligent way.  If you need to

22      take a break, just let me know.  There is a

23      restroom, water, coffee, et cetera; okay?

24            A.   Yes.

25            Q.   If you need to ask your attorney a
```

1    question, that's fine with me.  The only thing is

2    that if I ask you a very important question or

3    there may be one or two very important questions,

4    I ask that you don't ask to see your attorney

5    while the question is pending; okay?

6        A.   Yes.

7        Q.   After the deposition is concluded, you

8    will receive a transcript of what's going on here

9    today.  It will have everything that everybody

10   said:  question, answer, question, answer.  And

11   you'll be able to change your answers.  You can't

12   change my questions, but you can change your

13   answers.

14        And if you make significant changes, it

15   may affect your credibility.  I don't know, but

16   that's something I want you to know about.

17        Do you know what affecting your

18   credibility means?

19        A.   Yes.

20        Q.   Do you know what the word "impeachment"

21   means?

22        A.   Well, as it relates to a president,

23   yes.

24        Q.   Okay.  Impeachment in a civil

25   litigation context is if you and I were here to

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    talk about a routine traffic accident and you were
 2    the key witness or key player in the facts of the
 3    case and I said, "Mr. Corker, you understand you
 4    are under oath?"  And you said, "Yes, I do."  "Was
 5    the traffic light green or was it yellow or was it
 6    red?"
 7              And you told me after thinking about
 8    it, you gave me your serious testimony that it was
 9    green and then when you got your transcript back
10    you changed it to red and then we go to trial and
11    the status of the traffic light is the big issue
12    in the case, I would impeach you with that change
13    of testimony.
14              Do you understand that?
15         A.   Uh-huh.  Yes, sir.
16         Q.   So give your best testimony --
17         A.   I will.
18         Q.   -- and you don't need to make any
19    changes, there is no risk of impeachment; okay?
20         A.   I'm here to tell the truth.
21         Q.   Is there any reason why you cannot give
22    your best testimony; is there a health factor or
23    any other factor?
24         A.   No, sir.
25         Q.   I think that is pretty much it.  But if
```

Veritext National Deposition & Litigation Services
866 299-5127

1    you have any questions that arise during the
2    deposition, go ahead and ask me.  And if I
3    remember any of the other ground rules, I'll let
4    you know; okay?
5            A.   I will.  Thank you.
6            Q.   For how long have you been employed at
7    Wells Fargo?
8            A.   Just over 3 years now, about 3 years
9    and 3 months.
10           Q.   Is that here in this area?
11           A.   In Ketchum.
12           Q.   What is your role with Wells Fargo?
13           A.    I am -- the technical, the title for my
14   role is wealth advisor, which means I'm a client
15   relationship officer with the Private Bank at
16   Wells Fargo.
17           Q.   What was your employment prior to that?
18           A.   With Bank of America.
19           Q.   Where were you physically employed for
20   Bank of America?
21           A.    In Ketchum, Idaho.
22           Q.   What was your title?
23           A.    My title was -- I have to take a second
24   because I was a wealth advisor or am a wealth
25   advisor at Wells Fargo.  And at Bank of America,

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    it was wealth consultant.  They changed the title
 2    about three times while I was there, but I
 3    essentially did the same job which was client
 4    relationship officer.
 5         Q.   What was the address; do you remember?
 6         A.   411 North Main, I believe.  I'm not
 7    100 percent sure.  I think now we are 311 and we
 8    are one block away, so I think it was 411 North
 9    Main Street, Ketchum.
10         Q.   Is that a free-standing building or is
11    it a multi-unit commercial building?
12         A.   It's a multi unit.  There is a law firm
13    up on the second floor.  It's the main branch in
14    Ketchum for the Bank of America above the branch
15    where the private banking offices are.
16              We share the second floor with an
17    attorney and I think a property development
18    company.
19         Q.   So the bottom of the building is Bank
20    of America --
21         A.   Branch.  The consumer bank, yes.
22         Q.   The branch?
23         A.   Yes, sir.
24         Q.   And then you go up the stairs and/or
25    elevator and there's -- what do you call it?
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          A.    Private banking offices.

 2          Q.    Along with a separate law firm?

 3          A.    Correct, separate offices.

 4          Q.    Did your office at the private banking

 5     office have a separate telephone where you would

 6     receive telephone calls?

 7          A.    Yes, sir, it did.

 8          Q.    Down below at the consumer banking, was

 9     there some sort of office that received loan

10     applications for consumer loans?

11          A.    No, not a separate office.  The branch

12     manager or the -- I think they called them

13     personal bankers would process loans that came in

14     through that banking channel.

15          Q.    Did you process applications for

16     residential loans?

17          A.    Can you define for me what process

18     means?

19          Q.    Receive them, evaluate them, send them

20     up to the chain to underwriting.

21          A.    I received them and sent them on.  I

22     did not evaluate them.  I was not an underwriter.

23     I had no credit authority.

24          Q.    Did you have a job description that you

25     know of as the -- call it client relationship
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    officer?

 2         A.   I did have a job description.  I

 3    don't -- you know, again, three years later, I

 4    don't remember exactly what that was.  But it's

 5    somewhat like what I have today, which was to

 6    service clients.

 7              I have had at Bank of America and have

 8    at Wells Fargo, sales goals.  That is customary in

 9    a position like mine, but I don't have a written

10    job description.

11         Q.   Did you have one?

12         A.   I did then.  I do not -- I did not keep

13    it.  I did not take it with me.

14         Q.   And can you describe in any additional

15    detail what your job responsibilities were?  I'm

16    talking about with the Bank of America.

17         A.   Sure.  I've been doing the same job

18    more or less for 30 years.  In New York for 20

19    plus years and here for 10.  And I am a client

20    liaison to the bank, to the service of the bank.

21              I would partner with specialists in

22    other units, including the investment unit, the

23    brokerage unit, loans.  And I would bring those

24    specialists in as a team and help deliver the

25    service to the client on a local level.
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        Q.   What range of services are you talking
 2   about?
 3        A.   Deposit accounts; loans, including
 4   commercial and residential; brokerage accounts;
 5   and investment management accounts, including
 6   individual investments and fiduciaries where the
 7   bank was named as a fiduciary on that account.
 8        Q.   Anything else?
 9        A.   No, sir.  That's the best I can
10   recollect.  Those are the primary products of the
11   bank -- of the Private Bank.
12        Q.   For how long did you act as the client
13   relationship officer for Bank of America in this
14   area?
15        A.   Approximately, seven years.
16        Q.   Can you give me an approximate start,
17   stop?
18        A.   Uh-huh.  From about November of '02
19   until early March of '09.
20        Q.   Do you know somebody named Dr. Enright?
21        A.   Yes.
22        Q.   When was it that you first interacted
23   with him on a business level?
24        A.   As best I can recall, the first time
25   that I interacted with Dr. Enright on a business
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    level was with this particular loan transaction in
 2    approximately 2006.
 3         Q.   How did that come to pass that you
 4    worked with Dr. Enright?
 5         A.   He came to me.
 6              My job was not -- I didn't go out and
 7    cold call for loans.  That's not the way our job
 8    worked.  I was in the office.  And, I believe,
 9    although I'm not a hundred percent sure, that
10    Dr. Enright at that point had a relationship with
11    the bank.  He may even have had an account in the
12    Private Bank.  We had many clients that had been
13    with the Private Bank that did little or no
14    activity at that time.
15              But Dr. Enright came to me in my office
16    at the Bank of America and said -- asked that he
17    wanted to borrow some money.
18         Q.   Do you know somebody by the name of
19    Mimi Huck?
20         A.   Uh-huh.  Mimi Huck was in our office
21    when I started with the bank.  She had her book of
22    clients and I had mine.  And then Mimi retired,
23    it's probably around 2005, 2006.
24         Q.   Is that how you came to work with
25    Dr. Enright?
```

Veritext National Deposition & Litigation Services
866 299-5127

1         A.    It's possible that he had worked with
2    Mimi before then, and I wouldn't have known that.
3    I mean, I might have known.  If he was a really
4    big client of hers, I would have known.  But she
5    had her clients and I had mine.
6         Q.    Okay.  So it's possible that
7    Dr. Enright was one of her --
8         A.    It's possible.
9         Q.    -- retiring, I guess, one of her
10   clients after she retired and he was transferred
11   over to you?
12        A.    Yes, that's possible.
13        Q.    Do you have a specific recollection of
14   that or are you guessing at it?
15        A.    I don't have a specific recollection
16   because I didn't know all of Mimi's clients.  And
17   as I said, there were many clients who just had
18   checking accounts who did little to nothing with
19   us.
20             So I would only know if it was a client
21   who had transactions or had needs that required
22   interacting with him.  But I know my first
23   interaction with Dr. Enright was probably after
24   Mimi was gone, so that would make sense.
25        Q.    And sitting here today do you know what

Veritext National Deposition & Litigation Services
866 299-5127

1    holdings or what money or what assets he had,
2    Dr. Enright had with Bank of America at the time
3    he came to you?
4         A.   I don't.  I didn't.  In fact -- no, I
5    don't.
6         Q.   Why did Mimi Huck leave the bank; if
7    you know?
8         A.   She retired.  Her husband and her both
9    retired from their jobs.  They built a house down
10   near the airport here in Idaho.  She's been
11   retired and happily so.
12        Q.   So Dr. Enright came to you and he
13   wanted to borrow money from Bank of America.  Is
14   that the gist of the start of the relationship?
15        A.   Yes, sir.
16        Q.   And did he tell you what the purpose of
17   the loan was?
18        A.   He did tell me the purpose of the loan.
19        Q.   What do you recall?
20        A.   I recall that he had identified -- I
21   know they were horse people, cutting horses, I
22   believe.  Dr. Enright had once asked if the bank
23   would give some money to support -- this was after
24   the time when he first came to me -- to support
25   cutting horses.  But he was a horse person, he had

1  told me, he and his wife.

2          And he said he had found the perfect

3  property in Santa Ynez for the horses and that his

4  wife loved it and it was the ideal property and

5  they were ready to move from the valley and retire

6  down in that area.

7       Q.   Did you understand at that time, 2006,

8  that Dr. Enright was practicing his profession?

9       A.   Dr. Enright had told me that he was no

10  longer practicing.

11       Q.   For how long?

12       A.   I don't remember that.

13       Q.   All right.  So what did you do in

14  response to his request to get a loan to buy a

15  property in Santa Ynez?

16       A.   We talked about -- again, he told me

17  about the property.  He told me that it was going

18  to require some -- there were some things he and

19  Nancy wanted to do to the property if they were

20  able to purchase it.

21          He talked a lot about his property at

22  Eagle Creek.  I had never been to his property,

23  and so I was kind of going on what he was telling

24  me.  He was telling me that it was this big

25  extraordinary, one-of-a-time property in

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      Sun Valley, end of the canyon, and all this stuff.
 2      I had never been up Eagle Creek at that time.
 3              And we talked about the dollar amounts
 4      that he was going to need to purchase Santa Ynez.
 5      Again, he talked a lot about the value of his
 6      property, how valuable the Eagle Creek property
 7      was.
 8              I remember he talked about the property
 9      being worth $15 million or more.  And I remember
10      that and I know that because the appraisal came in
11      substantially lower, somewhere in the $9 million.
12      And I thought that was a very -- I talked about
13      that being a very big disparity.
14              And he had talked about how somebody
15      was looking to buy it.  He had somebody approach
16      him, he said, which I think turned out to be
17      obviously not a legitimate buyer.  But I remember
18      him telling me initially about this potential
19      buyer he had for the property.
20              And then we talked about the dollars
21      and what was going to be involved.  It was pretty
22      standard.  I told him what was going to be
23      required in order to underwrite:  Two years tax
24      returns, copies of asset statements.
25              Dr. Enright had IRA assets outside of
```

1    the bank.  The bank didn't manage those.  I didn't
2    oversee them.  In fact, Dr. Enright made
3    investment decisions himself.  It was a point of
4    pride for him.  We had talked about Dr. Enright
5    was -- knew about real estate.  He had -- he told
6    me about a real estate transaction that he had had
7    up north of Galina.
8              He told me in detail about a property
9    that he owned where he got an easement through the
10   forest -- I believe it was the forest service.  It
11   could have been through the Bureau of Land
12   Management -- and how successful that transaction
13   had been that he had gotten both the easement and
14   then sold the property.  And what a very good --
15   and that had been the property that he was in
16   before the Eagle Creek property.
17        Q.   So why did you think he was telling you
18   that information?
19        A.   You know, it wasn't unusual to have
20   those kinds of conversations.  I don't think there
21   was an ulterior motive.  I think we were just
22   talking about -- we had not worked together, so I
23   think we were sharing information.  He was telling
24   me about his background.  That is customary.
25        Q.   Where were these conversations where he

Veritext National Deposition & Litigation Services
866 299-5127

1    told you his real estate transaction, his easement

2    deal, et cetera?

3          A.   In our office.  We would either speak

4    by phone or in the office.  He would call

5    sometimes, but he would drop in frequently.  We

6    never met at his home or outside of the office

7    that I can recall.

8          Q.   Did you collect from him two years of

9    tax returns?

10         A.   I must have.  I mean, I don't remember

11    exactly what I got, but I must have or the

12    underwriting would never have been done.

13         Q.   And you said there was an IRA that

14    you -- that Bank of America didn't manage, right?

15         A.   Correct.

16         Q.   Did Bank of America or any of its

17    affiliates, subsidiaries, et cetera, manage any of

18    Dr. Enright's money?

19         A.   Not that I'm aware of, Matt.

20         Q.   Did the bank manage any of

21    Mrs. Enright's money?

22         A.   Again, not that I'm aware of.

23    Certainly not out of our office.  And this is a

24    little recollection -- I think Dr. Enright told me

25    at some point that there was a trust for Nancy as

Veritext National Deposition & Litigation Services
866 299-5127

1    well.  But I had no -- I don't remember getting
2    any financial information on that trust.  I don't
3    remember getting anything on that particular
4    trust.
5            So to the best of my knowledge, Bank of
6    America did not manage any of those investments.
7    And, again, that was a point of pride for
8    Dr. Enright.  He would tell me.  "Well, I bought
9    this" or "I did that."
10           And I mean - yeah.  He gave the very,
11   very strong, if not explicit, message that he did
12   not want -- he wouldn't let the bank manage his
13   investments.
14        Q.   Did you tell Dr. Enright to transfer
15   his wife's trust to some Columbia Funds to be
16   managed by a Bank of America subsidiary or
17   affiliate?
18        A.   No.
19        Q.   Do you know what Columbia Funds is?
20        A.   I know what Columbia Funds is.  It's a
21   money market -- yeah, I think it is a money market
22   fund.
23        Q.   Is it affiliated with Bank of America?
24        A.   I believe it is, yes.
25        Q.   Now, hypothetically, if Dr. Enright had

Veritext National Deposition & Litigation Services
866 299-5127

```
1    transferred his wife's funds or her trust into
2    Columbia Funds, would you receive some
3    remuneration for that?
4         A.   Not to the best of my knowledge.  I
5    don't believe we were compensated for Columbia
6    Funds, but I don't remember.  I had one other
7    client who used Columbia Funds that I was aware
8    of.  And I'm not aware of any -- I certainly
9    didn't have goals to sell Columbia Funds.
10        Q.   Did the Bank of America give you
11   promotional literature during this time to promote
12   Columbia Funds with your clients?
13        A.   We had to -- the only thing I remember
14   is we had to put up signs about, you know, it
15   being a brokerage office.
16             I don't remember ever seeing a Columbia
17   piece of literature in that office, ever.  There
18   was no strong connection with Columbia Funds to my
19   recollection.
20        Q.   Who was your actual employer?  Was it
21   Bank of America or something else?
22        A.   It was Bank of America.
23        Q.   Were you employed by U.S. Trust?
24        A.   U.S. Trust was acquired by Bank of
25   America while I was an employee.
```

Veritext National Deposition & Litigation Services
866 299-5127

1       Q.   Were you employed by U.S. Trust?

2       A.   No.  I believe I was employed by

3 Bank of America.  Coincidently, I had worked for

4 U.S. Trust back in New York prior to coming out

5 here, but I was -- so I was an employee of

6 U.S. Trust, but that was prior to U.S. Trust being

7 acquired by Bank of America.

8       Q.   Did you hold yourself out to

9 Dr. Enright as being employed by U.S. Trust?

10       A.   No, sir.

11       Q.   Were you a VP of U.S. Trust?

12       A.   When I was with Bank of America?

13       Q.   Yes.

14       A.   Yes, sir.

15       Q.   Were you a VP of U.S. Trust while you

16 managed Dr. Enright's relationship?

17       A.   Yes, sir.  My title was the same for

18 the entire seven and a half years.

19       Q.   So VP at U.S. Trust, Bank of America.

20 Is that your title?

21       A.   They changed the titles when they

22 acquired Bank of America, and I don't remember

23 exactly what year it was.  It was after I was

24 here.  Probably around the same time, around 2005,

25 2006.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              When they acquired Bank of America -- I
 2      mean, when Bank of America acquired U.S. Trust, it
 3      became -- I think they branded the Private Bank to
 4      be U.S. Trust.  So, I mean, I have to say, I'm not
 5      exactly sure.  I mean, I'm not exactly sure what
 6      it ended up.  I'm not even sure what it is --
 7      well, I don't even know what it is today.  But I
 8      always considered myself a Bank of America
 9      employee.
10           Q.    So my question was -- I'll ask it
11      again.
12           A.    Sure.
13           Q.    Did you hold yourself out as the senior
14      VP or VP of U.S. Trust?
15           A.    Yes.  My title was VP at Bank of
16      America Private Bank.
17              And when Bank of America acquired
18      U.S. Trust, I believe that they called it Bank of
19      America -- I don't -- so, I mean, that was my
20      title.  I was a VP at Bank of America's Private
21      Bank, which acquired U.S. Trust.  That was my
22      title.
23           Q.    Okay.  You weren't part of the consumer
24      lending department, were you?
25           A.    I was not, sir.
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1         Q.   You weren't part of the underwriting
 2    department, were you?
 3         A.   I was not.
 4         Q.   And is there a credit department?
 5         A.   There was an underwriting department
 6    specific to the Private Bank, so by credit if you
 7    mean underwriting, yes, sir.
 8         Q.   And so you were a member of
 9    underwriting at the Private Bank?
10         A.   I was not a member.
11         Q.   Not?
12         A.   I was a client relationship officer.  I
13    did not have underwriting authority, credit
14    authority as an underwriter.
15         Q.   Did you provide advice to Dr. Enright?
16         A.   Can you be more specific because we
17    would consult, yeah.  I mean, we would talk about
18    situations and relationships, and we would talk
19    about things.
20         Q.   So the answer is yes?
21         MS. McCONNELL:  No.  He asked you to be more
22    specific about the question.
23         THE WITNESS:  If you could be more specific
24    about what you mean by advice.
25    ///
```

```
 1    BY MR. CLARKE:
 2         Q.    Sure.   I mean, advice about the things
 3    you just referenced.
 4                Could you read back what he just said,
 5    please?
 6                (Record read by Reporter.)
 7         THE WITNESS:   Well, that's pretty general.
 8    BY MR. CLARKE:
 9         Q.    No.   I'm going to drill down on all of
10    these situations and relationships and things.
11         A.    Sure.
12         Q.    What situations did you consult with
13    him about?
14         A.    Well, Dr. Enright came to me and asked
15    to borrow money, so we would talk about what was
16    required in order to initiate a loan and process a
17    loan.
18         Q.    You would just tell him, "You've got to
19    bring in the tax returns and the assets
20    statements"?
21         A.    Right.   He wanted to know what was
22    required in order to secure a loan from the bank.
23         Q.    Is that what you call consulting?
24         A.    I would call a conversation with a
25    client a consultation.
```

Veritext National Deposition & Litigation Services
866 299-5127

1         Q.   So just telling him, "You need to bring

2   in a tax return" in your mind is a consultation?

3         A.   Yes, sir.

4         Q.   Are you giving him any advice?

5         A.   In what regard?

6         Q.   With regard to whether he should take

7   out a loan and how much and whether it's suitable

8   to his financial situation?

9         A.   I didn't underwrite the loans.  So if

10  somebody wanted to go forward with a loan, I would

11  tell them what was required in order to process

12  that loan.  I would -- if they had specific

13  questions about loans, I would answer those

14  questions to the best of my knowledge.

15           And, again, in Dr. Enright's case, he

16  wanted to go forward with this loan.  He had made

17  up his mind that he wanted to come in and borrow

18  money, so I told him what was going to be needed

19  in order to initiate that process.

20       Q.   What other situations did you consult

21  with him about?

22       A.   We -- I did not consult with him about

23  his IRA.

24       Q.   No.  I'm asking what you did consult

25  about.

Veritext National Deposition & Litigation Services
866 299-5127

1     MS. McCONNELL:  If you can remember, if

2     there was anything.

3     THE WITNESS:  Yeah.  We would -- when

4     Dr. Enright came into the office he usually had a

5     plan.  He was a very organized man.  He knew what

6     he wanted and he would set the agenda.  I would

7     respond to his questions.

8     BY MR. CLARKE:

9     Q.   Did he ask you how the interest on the

10    loan for Santa Ynez was going to be paid?

11    A.   When this loan was done for

12    Dr. Enright, we talked about him having to take a

13    home equity loan in addition to the mortgage.

14    Q.   Home equity loan on what property?

15    A.   The home equity loan was on the Eagle

16    Creek property, also, I believe.

17    Q.   So the purchase money loan would be on

18    Eagle Creek and the equity line would be on

19    Eagle Creek as well?

20    A.   Yes, sir.

21    Q.   And the money would go toward the

22    Santa Ynez property right?

23    A.   That's my recollection, yes.

24    Q.   And are you telling me the equity line

25    was going to pay the Santa Ynez property?

Veritext National Deposition & Litigation Services
866 299-5127

1          A.    The equity line was going to service
2     the debt I believe was -- yeah.
3          Q.    And who came up with that idea?
4          A.    Again, I don't know.  I mean, I don't
5     know if -- I know that it was something we talked
6     about.  I know it was something that made sense
7     because Dr. Enright had said that the plan always
8     was that this home was going to be sold and was
9     going to pay off the loans.
10              So the plan was that this home was
11    going to be sold in some reasonable amount of time
12    and that he didn't want to use his other assets to
13    pay for the loan.  He had requested this line of
14    credit, and then, in fact, came back and asked for
15    an increase in the line of credit on more than one
16    occasion.
17         Q.    What were the other assets that you
18    just referenced from which he did not want to pay
19    or service the debt, the new debt?
20         A.    I guess whatever Nancy had in trust and
21    then his investments, his outside investments.
22         Q.    Which were his, what, retirement
23    account?
24         A.    And whatever else he had, yeah.
25         Q.    What else did he have?

Veritext National Deposition & Litigation Services
866 299-5127

```
 1           A.   I don't remember, but I don't think it
 2    was significant because I don't remember what it
 3    was.  If it was a significant asset, I would
 4    remember it.  But I certainly don't want to say
 5    that he didn't have other checking accounts and
 6    other things.
 7           Q.   So the other assets that you can
 8    remember are his retirement account, right?
 9           A.   Uh-huh.
10           Q.   Is that a yes?
11           A.   Yes.
12           Q.   And Nancy's trust; is that the other
13    one?
14           A.   Yes.
15           Q.   And did you, in your view, come up with
16    a plan to do this?
17           A.   In my view with Dr. Enright -- and he
18    was not typical of every client.  Dr. Enright is a
19    very strong personality.  Dr. Enright drove the
20    decision making.  Dr. Enright is the one who came
21    to me with a plan to buy Santa Ynez.  Obviously,
22    it's not my job to look around to real estate.
23    I'm not a realtor.  I don't know anything about
24    residential real estate.
25                And he is the one who asked to
```

Page 31

```
1    structure a loan to help him and Nancy acquire
2    Santa Ynez.  And, again, he knew the plan always
3    was -- and I'm clear on this because this was
4    clear -- the plan always was that the way that he
5    was going to pay off the bank and this was going
6    to get satisfied was to sell the Eagle Creek
7    property.
8          Q.   And this was in 2006?
9          A.   I believe so.
10         Q.   What was the climate of the real estate
11   market here at the time?
12         A.   It was overheated.  And I say that
13   because I know, because we had gone from, in the
14   short time that I was here, we went from four
15   banks to nine banks in our community.
16              And I remember having a conversation
17   with my boss when Mimi Huck retired about
18   replacing a banker.  And I said to my boss at the
19   time that it didn't make sense to replace Mimi
20   because we were over banked.  And I felt there was
21   going to be a shakeout.
22              It just didn't make sense to add
23   another banker in our market.
24         Q.   Were you a banker?
25         A.   When I say banker, I mean private
```

Veritext National Deposition & Litigation Services
866 299-5127

1    banker, yes, sir.

2        Q.    Okay.  So you considered yourself a

3    banker?

4        A.    Yes, sir.  Banker relationship officer.

5        Q.    All right.  And Mimi was not replaced,

6    was she?

7        A.    She was not replaced.

8        Q.    So in 2006, did you have kind of a

9    premonition that there was going to be a bursting

10   of a bubble?

11       A.    No, I can't say that.  I wish I could

12   say that I knew that the real estate bubble was

13   going to burst.  When I first came here, when I

14   started here I had been told by people that real

15   estate in this valley never goes down, that it

16   goes sideways for a time.

17            I will tell you because it was

18   representative of my sentiment about real estate

19   that I did, you know, we did purchase property

20   when we bought our home and we sold that in 2000.

21   So it was about five -- well, we came in 2002, so

22   we did sell that property before the bubble burst.

23            So I did think the prices doubling in

24   just 4 or 5 years was not sustainable.

25       Q.    Did you have discussions with

Veritext National Deposition & Litigation Services
866 299-5127

1    Dr. Enright about that particular risk that you
2    are talking about, the value of his property going
3    down?
4          A.    I don't remember having that
5    conversation.  What I remember when we talked
6    about real estate -- because, again, Dr. Enright
7    was the expert on residential real estate, I was
8    not -- Dr. Enright would tell me what his home was
9    worth, how unique his property was, how
10   extraordinary it was.
11               I remember questioning Dr. Enright's,
12   the values he was assigning to the properties when
13   we got an appraisal that came in substantially
14   below that, to which he replied something about,
15   "Well, there are no comps really for my property,"
16   which is a reasonable thing in this valley.  We
17   hear that a lot.  There is just not a comparable
18   property.
19               But, no, I certainly -- I mean, there
20   is very few people that knew that that bubble was
21   going to burst the way it did.  And by the way, it
22   still affects this valley dramatically.  We still
23   have a residential -- we had become so dependent
24   on residential real estate in this valley.  I'm
25   talking about globally.

```
 1                It's really, you know, like any market
 2       that had become overly inflated, it's going to
 3       take longer to heal.
 4            Q.   When you said "Dr. Enright was the
 5       expert on the residential real property," what did
 6       you mean by that or what was the basis for that
 7       statement?
 8            A.   You know, his knowledge of the way he
 9       talked.  I mean, it was what he did at that point.
10       He was retired; I knew that.  He told me that he
11       was retired as a thoracic surgeon.  He shared with
12       me that he had been very successful with the real
13       estate property up north.
14                And, again, I don't remember all the
15       details of that transaction because I wasn't
16       involved, but I know it was a point of pride for
17       him.  And he made a lot of money on it.  And,
18       again, my understanding -- and I don't know if
19       that is 100 percent accurate -- is that he took
20       that and he parlayed that into his Eagle Creek
21       home, which was an extraordinary -- by every
22       description that he gave, it was an extraordinary
23       property.
24            Q.   Did you ever see it?
25            A.   I did not see it.
```

1      Q.   Did you see it on paper?

2      A.   I saw the appraisal was the first time

3   I saw the property.

4      Q.   And whose appraisal was that?

5      A.   I don't remember.  I don't know who did

6   the appraisal.  And I obviously don't have a copy

7   of that appraisal.

8      Q.   Was that part of the underwriting

9   process for the loans?

10     A.   Yes, sir.

11     Q.   Your recollection is that it came in

12  about $9 million?

13     A.   That's the best -- I just know it

14  was -- yeah, it is, because I don't remember it

15  being ten.  And I remember -- yes.

16          And I think in my mind, the other

17  reason I remember that is because I remember it

18  being that the loan to values were still like

19  50 percent, which is what they came in at,

20  something in that order, which is ultimately why

21  it got approved.  I think one of the reasons it

22  got approved was because it was below that

23  50 percent loan to value.

24     Q.   What debt, if you know, was already

25  existing on the property?

```
 1          A.    I wasn't aware of any.
 2          Q.    All right.  I assume you gathered the
 3   documentation, the tax returns, et cetera?
 4          A.    Yes, sir.
 5          Q.    Do you remember evaluating what income,
 6   if any, Dr. Enright had?
 7          A.    That wasn't my responsibility.  I would
 8   literally take that information, put it together
 9   in a package and inter-office it to underwriting.
10          I didn't do any of the what the
11   underwriters would call spreads, where you look at
12   the income and you analyze it.
13          Q.    Based on your conversations with
14   Dr. Enright, did you understand he had no
15   employment income?
16          A.    I knew that Dr. Enright was no longer
17   working as a surgeon.  I certainly was aware of
18   that.  And, you know, again, the structure at the
19   time -- I mean, I think there was an understanding
20   that the way that the loan was going to be
21   serviced was through the home equity line until
22   such time it could be sold.
23          Q.    What discussions did you have with
24   Dr. Enright about the possibility that the home
25   equity line would run out before the home was
```

Veritext National Deposition & Litigation Services
866 299-5127

1    sold?

2          A.    Dr. Enright was very confident that

3    that home was going to sell.  He was very

4    confident that that home was going to sell.

5               And I'm sure that there were

6    discussions about -- and I don't remember

7    specifically doing calculations, but I'm sure

8    there were discussions about that home equity line

9    and servicing the debt for a reasonable period of

10   time.

11              And, again, I'm using his -- I mean,

12   Dr. Enright was the one who asked for that amount

13   for the home equity line.  He knew that that was

14   going to be used to service the debt.

15         Q.    Did you do the calculations that you

16   just referred to?

17         A.    I don't remember doing them, no.  But I

18   remember talking to Dr. Enright about the home

19   equity loan and servicing the debt, but I don't

20   remember calculating it for him.

21         Q.    Do you have a ballpark length of time

22   in mind that you and he discussed?

23         A.    I don't remember.

24         Q.    Did you ever tell Dr. Enright that he

25   needed to speak with a financial advisor to figure

Veritext National Deposition & Litigation Services
866 299-5127

```
 1   out whether this plan was going to work or not?

 2       A.   I don't remember telling him that, no.

 3       Q.   He had you, didn't he?

 4       A.   Yeah.  We talked about it.  I mean, we

 5   certainly decided -- he decided that, again, this

 6   was something that was going to work and he was

 7   going to be able to sell that home in the period

 8   of time to make this all work.

 9       MS. McCONNELL:  Is your question whether Bob

10   was acting as his financial advisor?

11            Can you read that last question back,

12   please?

13            (Record read by Reporter.)

14       MS. McCONNELL:  I'm going to object to the

15   question.  I'm going to ask you to restate it by

16   what you mean; it's a little ambiguous.

17       MR. CLARKE:  He's already answered it.

18       MS. McCONNELL:  Well, tell me, did you

19   understand that question that he was asking you if

20   you were Dr. Enright's financial advisor?

21       THE WITNESS:  Not the way it was asked the

22   first time.  He asked if I referred him to a

23   financial advisor.  And I said no, I didn't

24   recollect that.  And he said -- then when he said

25   because I was filling that role?
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          MS. McCONNELL:  He asked you something like
 2     that, yeah.
 3          THE WITNESS:  I mean, again, I would say,
 4     what do you mean by financial advisor in that
 5     role?  I was processing -- I'm a local
 6     relationship officer.  Dr. Enright asked for a
 7     loan.  I processed the paperwork for that loan.
 8     And yes we had discussions around, you know,
 9     around the loan and how, you know, I answered
10     whatever questions Dr. Enright had to the best of
11     my ability.
12          MR. CLARKE:  The questions were about the
13     loan and whether they were feasible; weren't they?
14          MS. McCONNELL:  What do you mean?
15          THE WITNESS:  Yeah, what do you mean by
16     "feasible"?
17          MR. CLARKE:  Whether it would work, whether
18     it was doing something absolutely stupid.
19          MS. McCONNELL:  Well, wait a minute.
20          THE WITNESS:  No, I don't see that.  I
21     object to that because here's the thing.
22     Dr. Enright was a very strong personality.  I'll
23     make this --
24          MR. CLARKE:  I have heard that many times.
25          MS. McCONNELL:  Let him finish.
```

Veritext National Deposition & Litigation Services
866 299-5127

```
1            THE WITNESS:  No, I want to make this clear
2    because this is the kind of client you worked
3    with.
4            He came in and he had a plan.  His plan
5    was to borrow against his house.  His plan was to
6    pay -- his plan.  I didn't go to Dr. Enright and
7    say, "Hey, here's a plan, Dr. Enright."  He came
8    to me and said -- that's why I objected to this
9    whole situation -- because this is a very smart
10   guy who came to me with a plan and said, "This is
11   what I want to do.  Can you get me those loans?"
12   I said to him, "This is what you need to get me
13   and I will send it off to underwriting."
14           He had figured out that he needed a
15   home equity loan to pay the debt.  He was the
16   expert.  He told me what his house was going to
17   sell for, when it was going to sell.  I never
18   ever, ever, ever, not with Dr. Enright or any
19   client, held myself out to be a residential real
20   estate expert.
21           I never said to him, "Your house is
22   going to take one year or two years or three
23   years."  That's not my role.  That is not my
24   responsibility.  I understand that clearly.
25           So I did not advise him to do any of
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    this.  I simply worked with him to try to
 2    accomplish his plan.  This was not my plan going
 3    to Dr. Enright, "Hey, I have a great idea,
 4    Dr. Enright, let's go out and let's borrow this."
 5           He came to me and said, "This is what
 6    we can do and this is how we can do it.  Can you
 7    lend me additionally a home equity loan?"  "Gee,
 8    Dr. Enright, I don't know.  That's up to the
 9    underwriters."  When he came back to me for an
10    increase to that, I said, "I don't know.  We can
11    submit it."
12           So that's why I -- I mean, that's why I
13    say, this was a man who knew exactly what he was
14    doing.  This was a guy who knew real estate, I
15    always assumed, better than I.
16    BY MR. CLARKE:
17       Q.   You assumed that he knew better than
18    you; is that what you meant?
19       A.   Residential real estate.
20       Q.   Okay.
21       A.   Yes, sir.
22       Q.   What was your expertise?  I understand
23    what you are saying it was not.
24       A.   Right.
25       Q.   What was your expertise as U.S. Trust
```

Veritext National Deposition & Litigation Services
866 299-5127

1    or I should say senior vice president, U.S. Trust,

2    Bank of America, Private Health Management?

3          A.   I have good people skills.  I'm a

4    generalist.  That's not a dodging answer.  You

5    know, I listen to people.  I try to help them

6    accomplish their goals.

7                I certainly -- I know you are not

8    asking -- I certainly am sorry that this

9    Dr. Enright turned out the way it did, but the

10   real estate market crashed.  I mean, it crashed in

11   a way that none of us could foresee.

12         Q.   You told me earlier that you gave him

13   advice about situations, relationships, and

14   things.  We had that answer read back.

15               Do you remember that?

16         A.   Yeah.  I think I said I consulted with

17   him about those things.

18         Q.   Consulted, thank you.  We are talking

19   about the situations.  What relationships did you

20   consult with him about?

21         A.   I mean, I think what I meant when I

22   answered that question is that I consult about

23   relationships, about what people are trying to

24   accomplish, what are their goals and objectives,

25   what do they want to do -- in Dr. Enright's case

Veritext National Deposition & Litigation Services
866 299-5127

1    what we talked about.

2          So I used the word "consult" almost as

3    a synonym for "talk with," you know, is his goal

4    was -- you know, he was very clear.  He wanted to

5    retire outside of this valley in Santa Ynez.  He

6    wanted to move Nancy there.  It was a horse

7    property.  It was what they wanted as the next

8    step in their lives.

9      Q.   Are you telling me that with

10   Dr. Enright you basically just pushed paper from

11   here to there and didn't give him any advice at

12   all?

13     A.   I'm saying that Dr. Enright and I

14   talked about the deal.  I'm saying Dr. Enright was

15   somebody who came in.

16          I have clients who come in that don't

17   know about things, that don't have a plan, that

18   don't know what they want to do.  That is a very

19   different client.  I'm saying that Dr. Enright

20   showed up in my office and requested a loan.

21   Saying that Dr. Enright understood that in order

22   to pay for that loan, he was going to have to

23   borrow the money to make the debt service

24   payments.

25          And I am saying that I would listen to

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    him and I tried to -- I did try -- as a bank
 2    charge to do that with the bank, I did, if you
 3    want to call it paper pushing, I did.  I talked to
 4    him.  I listened to him, and then I tried to work
 5    with him to get those loans.
 6         Q.   Why did Dr. Enright need a senior VP to
 7    accept a request for a loan?
 8         A.   Because that was my job.
 9         Q.   Wasn't there a residential lending
10    department right down blow you?
11         A.   Yeah.  They wouldn't have done a deal
12    like this.
13         Q.   Why not?
14         A.   Because it was above their minimums.
15         Q.   Above their minimums, meaning that --
16         A.   I mean above their maximums, excuse me.
17    Above the maximums.
18         Q.   The loans were too large?
19         A.   I don't remember exactly what their
20    maximums were.  But, yeah, he would not have gone
21    to the residential real estate lender in the
22    branch.  He would have come to the Private Bank
23    for a loan like that.
24         Q.   The loan setup was too complicated for
25    them; is that true?
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          A.   No.   I wouldn't say that.   I don't know
 2    how they worked.   Again, I don't know if they've
 3    ever done deals like that.   What I would say is
 4    that Dr. Enright obviously had a relationship with
 5    Mimi.   Now we've kind of figured that out.
 6              But I think typically a deal on a $12
 7    million property would go through the -- or
 8    whatever the value of that property was, would go
 9    through the Private Bank rather than through the
10    branch residential loan team.
11          Q.   The $12 million is which property?
12          MS. McCONNELL:   Well, wait a minute.   I'm
13    going to object to that.   You said whatever the
14    property was.
15          THE COURT:   I said 12 million then I said
16    whatever the property was worth.
17          MR. CLARKE:   Oh, okay.   Sorry.
18          MS. McCONNELL:   Because Dr. Enright told you
19    it was worth 15.
20          THE WITNESS:   Right.
21          MS. McCONNELL:   And then your appraisal came
22    back at 9.
23          THE WITNESS:   Exactly.   Exactly.   So I sort
24    of split the difference.
25    ///
```

BY MR. CLARKE:

 2          Q.    So you just threw the number out; is

 3    that what you are saying?

 4          A.    No, I am not saying that.  I'm saying

 5    that I misspoke and that the property was

 6    appraised for $9 million.

 7          Q.    Okay.  The underwriting people --

 8          A.    Yes, sir.

 9          Q.    -- that looked at this loan application

10    that you pushed over to them, was a special

11    underwriting department or was it just any old

12    underwriting department?

13          A.    It was the underwriting department of

14    the Private Bank.

15          Q.    And where were they physically located?

16          A.    I believe, I'm not a hundred percent

17    sure, but I think they were located in St. Louis.

18    I think that's what I remember.

19          Q.    Did you inform Dr. Enright that your

20    role was basically to pass the paper that he gave

21    you onto the underwriting department?

22          A.    Yes, sir.  Dr. Enright was well aware

23    that I did not approve the loans and that they

24    went to an underwriting department.

25          Q.    How did he become aware of that?

Veritext National Deposition & Litigation Services
866 299-5127

1          A.   I know he was aware of it because after

2     he came back and asked for a second increase to

3     the home equity line of credit and I told him that

4     that was not going to get approved.  And I'm sure

5     I told him that there was an underwriting

6     department, that I didn't have the authority to

7     approve loans on a local level.  He was well aware

8     of that.  He had asked if it were possible to

9     speak with somebody in that group.

10         Q.   What did you tell him?

11         A.   I tried.  I tried to make that

12    connection.  I honestly don't know -- remember if

13    he spoke to somebody or not.  I mean, I seem to

14    remember that he did because I can't believe that

15    Dr. Enright wouldn't -- that we wouldn't have

16    tried to make that happen whether it be a manager

17    of that group or something.  I mean, we tried to

18    respond to those kinds of requests.

19              But I certainly wasn't a party to a

20    conference call or something that I remember, but

21    it would not have been unprecedented to have an

22    underwriter speak to a client or manager of an

23    underwriting team speak to a borrower.

24         Q.   Did you ever author anything, an e-mail

25    or memo or letter to Dr. Enright outlining that

Veritext National Deposition & Litigation Services
866 299-5127

1    you were trying to help him fulfill his plan as
2    opposed to your plan?
3            A.    No, sir.  I don't remember ever
4    authoring a document.
5                  You know, I was trying to think coming
6    in if Dr. Enright and I even exchanged e-mails.
7    Most of our contact was either face to face and
8    across the desk or over the telephone.  I
9    certainly don't remember authoring anything like
10   what you were describing.
11           Q.    Did you author any e-mail, memos,
12   faxes, letters saying that there were risks
13   involved with this plan?
14           A.    I don't remember specifically sending
15   an e-mail to Dr. Enright outlining the risks of
16   this plan, other than the loan documents that he
17   would have received and to the extent that they
18   would address something like that.  But then,
19   again, I'm not absolutely familiar with that.
20           Q.    After submitting all the materials, how
21   long did it take to have the loans approved; do
22   you know?
23           A.    I can guess here if you want.
24           Q.    Give me an estimate.
25           A.    I'll give you an estimate.  Probably

Veritext National Deposition & Litigation Services
866 299-5127

1  about 60 days; that's kind of what things were

2  taking at that time, approximately, 30 to 60 days.

3       Q.   And the loan was basically -- let's

4  take money out of the Idaho property, purchase the

5  Santa Ynez, and then a line of credit he could

6  draw upon, correct?

7       A.   That is my recollection, yes.

8       Q.   And did Dr. Enright indicate to you

9  that he actually moved to Santa Ynez?

10       A.   I mean, he was still here a lot, so --

11  I knew at the end he was living in Santa Ynez

12  because he told me he was doing a lot of upgrades

13  and working on the property and doing things down

14  in Santa Ynez.  So I knew he was obviously

15  spending time there.

16       Q.   Did --

17       A.   I didn't know if he changed his, like

18  became a California resident or that aspect of it,

19  I'm not aware of.

20       Q.   Did he keep you informed of the

21  progress on trying to sell the house here?

22       A.   Not on a regular basis.  But, I mean,

23  he would certainly when we talked, I mean,

24  obviously he didn't keep me -- I mean, he didn't

25  say how many people saw the house or whether it

Veritext National Deposition & Litigation Services
866 299-5127

1    was shown and how many times.

2           I didn't get details like that at all,

3    but he certainly didn't call me and say, "Gee, I

4    have a buyer for the house."  I mean, you know, he

5    also didn't tell me -- he didn't keep -- he didn't

6    call me and say, "I've dropped the price another

7    million."  I don't know what he was doing with the

8    listing because I didn't -- he didn't -- he just

9    didn't tell me where those things were.

10          But, obviously, I would have known --

11   he would have called me.  We would talk

12   periodically so he would tell me, gee, the house

13   is -- I've got an offer on the house or something.

14   I obviously didn't hear that from him.

15        Q.   Periodically you would talk.  What does

16   that mean?  And this is post-loan funding.

17        A.   I mean, I don't know.  I can estimate

18   if you want.

19        Q.   Yes, please.

20        A.   It certainly wasn't weekly.  I wouldn't

21   see him a lot.  It would be, you know, there could

22   be months that would go by and I wouldn't talk to

23   him.  You know, it could be three, four,

24   five months before I heard from him or we would

25   talk.

Veritext National Deposition & Litigation Services
866 299-5127

1         Q.   Were you monitoring the line of credit

2   during that time?

3         A.   What do you mean by monitor?  I

4   wouldn't look at it daily at all, but, I mean, I

5   had access to that line if I wanted to see where

6   the line was.  But I did not look at it on a

7   regular basis, no.

8         Q.   Did you look at it during the first

9   year after it was approved?

10        A.   I don't remember.  But I'm sure if

11   Dr. Enright came in, at some point we would have

12   talked about where the line was.

13        Q.   Why?

14        A.   Why?

15        Q.   Yeah.  Why.

16        A.   To see --

17     MS. McCONNELL:  Well, this is hypothetical.

18   You said you don't remember this happening.

19     MR. CLARKE:  He said I'm sure we talked

20   about it.

21        Could you read back his response?

22     MS. McCONNELL:  I think he said I don't

23   remember, but I'm sure we did.

24     THE WITNESS:  Yeah, I don't remember

25   specific conversation about it, but, again,

Veritext National Deposition & Litigation Services
866 299-5127

1    knowing Dr. Enright.
       2              (Record read by Reporter.)
       3    BY MR. CLARKE:
       4         Q.   When was it?
       5         A.   When was the conversation?
       6         Q.   No, about where the line was or when
       7    were those conversations.
       8         MS. McCONNELL:  I think he answered that.
       9    He said he doesn't remember, and he was
      10    speculating that maybe he -- they did talk about
      11    it.
      12         MR. CLARKE:  I heard the words "I am sure."
      13    BY MR. CLARKE:
      14         Q.   Is that what you said, sir?
      15         A.   I said that when Dr. Enright came in,
      16    he -- at some point we would have talked about it,
      17    yeah.
      18         Q.   Why were you monitoring the line of
      19    credit with Dr. Enright?
      20         MS. McCONNELL:  He said --
      21         THE WITNESS:  I didn't.
      22         MS. McCONNELL:  Wait.  Wait.  Wait.  Wait.
      23    Wait.  He said he didn't say he was monitoring it.
      24         MR. CLARKE:  Okay.
      25         MS. McCONNELL:  That's not what he said.

Veritext National Deposition & Litigation Services
866 299-5127

BY MR. CLARKE:

    Q.   When Dr. Enright came into your office,
you and he would look at the line of credit to see
what the status was, correct?

    MS. McCONNELL:  If you remember doing that.

    THE WITNESS:  Yeah.  And I don't remember
specifically doing that.  I don't know.

BY MR. CLARKE:

    Q.  So now are you saying it didn't happen
or you don't remember?

    A.  I'm saying I don't remember.

    Q.  Okay.  So when you said, I'm sure when
he came in we looked at it, you are now saying
that that testimony was false?

    MS. McCONNELL:  Wait a minute.  He said he
doesn't remember and he was speculating that that
was something that probably happened.

    MR. CLARKE:  No.  Your words were "he's
speculating."  He never said, "I'm speculating."

    MS. McCONNELL:  Well, you know, if you are
going to start accusing my witness of giving false
testimony, we can cut the deposition off.

    MR. CLARKE:  No.  I'm not saying that.  I'm
just saying he said one thing and now he's saying
he can't remember any of it.

Veritext National Deposition & Litigation Services
866 299-5127

1        MS. McCONNELL:  His testimony is consistent

2    that he didn't remember.  You asked him to

3    speculate about what might have happened based

4    upon his experience as a banker in the normal

5    course of his operations and how he handled

6    relationships.

7        MR. CLARKE:  All right.

8        MS. McCONNELL:  And now you are trying to

9    trap him into a contradiction that he never made.

10        MR. CLARKE:  Let's move on.

11   BY MR. CLARKE:

12        Q.   Your custom and practice as the

13   relationship manager was to review debts for your

14   clients when they came in?

15        A.   If that's what they wanted to talk

16   about, yes.

17        Q.   And Dr. Enright when he came in after

18   the line of credit was funded, what other issues

19   did he have to talk to you about?

20        A.   What was happening with his property.

21   If it, you know, if it sold, general things, but

22   nothing...

23        Q.   Horses?

24        A.   Sometimes.

25        Q.   What did you care what was happening

Veritext National Deposition & Litigation Services
866 299-5127

```
 1     with his property?  You just got him a loan,
 2     right?
 3              A.   Uh-huh.
 4              Q.   Yes?
 5              A.   Yes.
 6              Q.   So why did you need to meet with him
 7     again?
 8              A.   Because he was a client of the bank.
 9              Q.   Client for what?
10              A.   He had borrowed money from the bank.
11              Q.   So when somebody like Dr. Enright comes
12     in, what was your routine practice?
13              A.   I would sit and talk to the client.
14              Q.   So with Dr. Enright, do you remember
15     any meeting with him whatsoever after the loans
16     funded?
17              A.   I'm sure Dr. Enright came into my
18     office after the loan funded.
19              Q.   What did you talk about?
20              A.   I don't remember specifically.
21              Q.   Is there anything in writing that you
22     can think of that would reflect what you spoke
23     about?
24              A.   No, sir.
25              Q.   Is there any e-mail that you exchanged
```

Veritext National Deposition & Litigation Services
866 299-5127

1     with him that might reflect what you talked about?

2          A.   I don't remember exchanging any e-mails

3     with the Enrights.

4          Q.   Any reason why not?

5          A.   Any reason why we wouldn't have done

6     that?

7          Q.   Right.

8          A.   That really would be the client

9     preference.  I would correspond with some clients

10    by e-mail, some face to face, and some by phone.

11    It depended on what made that client most

12    comfortable.

13         Q.   When you met with Dr. Enright after the

14    line of credit and the loan funded, I know you

15    can't remember any of those instances

16    specifically, did you make a note in your

17    calendar?

18         A.   That I met with him?

19         Q.   When you have an appointment, do you

20    write it down somewhere?

21         A.   Yeah.  I do keep a desk calendar with

22    my appointments.

23         Q.   How about on Outlook?  You know what

24    Outlook is?

25         A.   I do know what Outlook is.

1          MS. McCONNELL:  In 2006 to 2007 you are

 2     talking about?

 3     BY MR. CLARKE:

 4          Q.   Anytime after the loan funded.  That

 5     would be 2007 to 2009, right?

 6          A.   Yes.  I didn't keep records on Outlook

 7     to the best of my recollection.  I used a desk

 8     calendar.

 9          Q.   Where are your desk calendars right

10     now?

11          A.   I have no idea.  They are long gone.

12          Q.   Meaning you destroyed them or lost them

13     or what?

14          A.   I didn't destroy them.  I don't know if

15     they would have been shredded when I left B of A.

16     I have no idea what was done with that kind of

17     stuff.

18          Q.   Your departure from B of A was rather

19     sudden, wasn't it?

20          A.   Yes, sir.

21          Q.   Did you take a box of calendars with

22     you?

23          A.   I did not.

24          Q.   You left them there?

25          A.   Yeah.  In fact on my last day, they had

1    a gentleman come in and said, "You and Colette
2    need to go today."  And we walked out empty
3    handed.
4         Q.   So were there calendars on your desk?
5         A.   I have no idea if a 2006 -- certainly
6    there would have been a 2009 calendar on my desk.
7    I have no idea if the 2006 calendar, 2007, even
8    2008 were still around at that time.  I have no
9    idea.
10           As a routine practice, I don't keep my
11   calendars.
12        Q.   Okay.  That was my next question.
13           So the current calendar was there and
14   you did not take it with you, right?
15        A.   That -- sure.  Yes.
16           And I would not have written down every
17   meeting anyway.  If Dr. Enright walked in, I
18   didn't write down, "Oh, I met with Dr. Enright."
19   If I had a scheduled meeting, if someone called to
20   schedule a meeting, I would say 10:00 a.m., you
21   know, Mrs. Smith.
22        Q.   Sure.  Was it common for Dr. Enright to
23   drop in unannounced?
24        A.   I wouldn't say it was common, but he
25   dropped in.  He would usually call first.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          Q.   The same day or the day before or what?

 2          A.   Same day.

 3          Q.   And you would meet with him?

 4          A.   Sure, when Dr. Enright wanted to meet

 5     with me.

 6          Q.   The way that you look at the status for

 7     a line of credit, for example, hypothetically, if

 8     Dr. Enright came in and you and he sat down and

 9     said, "Let's check out the status of your line of

10     credit," you would look at a computer?

11          A.   Yeah, you would pull the line of credit

12     up by the line account number.

13          Q.   On what program?

14          A.   I'm not sure I remember.  I mean,

15     honestly, I don't remember now.

16          Q.   Okay.

17          A.   I don't remember what program it was.

18          Q.   That's fine.  You only have to say it

19     once.

20          A.   No.  I'm just trying to think -- I

21     mean, I'm literally trying to think.  I don't

22     remember.

23          Q.   All right.  No problem.  But you would

24     have to log in and call up the loan?

25          A.   Yeah.  You would put a loan number in.
```

1      Q.   Was there a record of you accessing the
2    loan information, if you know?
3      A.   I certainly don't know that.  I don't
4    have any idea.
5      Q.   And the program you are talking about,
6    I know you don't know the name, but was it the
7    standard program for viewing loans at Bank of
8    America at the time?
9      A.   Yeah.  I'm sure it had to be.  It had
10   to be whatever system it was that recorded the
11   Private Bank loans.  I would not say that it was
12   all of the bank loans.
13     Q.   Okay.  Who else besides yourself, if
14   anybody, was working with Dr. Enright on his
15   relationship with the bank?
16     A.   Well, I had an associate, an assistant
17   Colette Pruitt.  But, again, to the best of my
18   recollection, she didn't meet with Dr. Enright
19   very often.  She would handle things like
20   transfers from checking to savings, that kind of
21   thing.
22     Q.   For Dr. Enright?
23     A.   No.  For clients, generally.  I don't
24   ever remember Dr. Enright meeting with Colette,
25   but I can't say that I wasn't in one day.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1          Q.   Did you ever consult with Dr. Enright
 2    on any other loans?
 3          A.   No, sir, not to the best of my
 4    recollection.
 5          Q.   Did you consult with Dr. Enright on any
 6    other financial ideas that he had?
 7          A.   No.  As I say, Dr. Enright told me
 8    about how, you know, how he managed money and
 9    picked stocks for his IRAs.  And it's what he did
10    and he liked doing, so we talked about it.
11               I didn't -- I mean, consider that
12    consulting, then he would tell me how he managed
13    money.
14          Q.   Did you ever make a pitch to get his
15    IRA into some Bank of America affiliate or
16    subsidiary?
17          A.   No.  You know, the bank wanted us to,
18    you know, work with clients in multiple product
19    areas if possible.  But, again, I will say
20    Dr. Enright made it abundantly clear that he
21    managed his own investments.
22               And that's not -- by the way, that is
23    not unusual in this market.  There are many
24    clients who manage their own investments, so I was
25    accustomed to that.
```

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.   Did you ever refer him to any other
2   professionals like accountants, attorneys?
3      A.   No, sir.
4      Q.   Do you know how it was that he got in
5   touch with his real estate broker or agent?
6      A.   I don't.
7      Q.   The relationship with Dr. Enright was
8   transferred to somebody else upon your departure,
9   correct?
10      A.   Yes, sir.
11      Q.   And to whom was it transferred?
12      A.   My understanding is that the accounts,
13   all the accounts in the office went down to an
14   associate in Boise, Brett Barton.
15      Q.   And what information did you share with
16   Brett Barton relative to the relationship with
17   Dr. Enright?
18      A.   I didn't have an opportunity to talk to
19   Brett about any of the relationships.
20      Q.   Why not?
21      A.   Because we were originally told that we
22   were going to be allowed to remain in the branch
23   for three weeks or thereabouts, so we still had
24   about two weeks left.  And then they came and said
25   that -- management said they had decided to move

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    that up and then asked my associate Colette and I
 2    to leave that afternoon.
 3            Q.    For what reason?
 4            A.    They did not give an explicit reason to
 5    me.  Yeah, we were surprised.  We were surprised.
 6            Q.    Did you ever express to Dr. Enright any
 7    approval or disapproval of this loan structure
 8    that he came to you with?
 9            A.    What I remember, and I thought about
10    this coming in, I remember saying to Dr. Enright
11    that it might make sense for him to sell his
12    property in Sun Valley before he bought the
13    Santa Ynez property.
14                  And what he said to me was that Nancy
15    loved this property in Santa Ynez and it was a
16    unique opportunity, that it was a one-of-a-kind
17    property.  Obviously paraphrasing, but that was
18    his -- that was his motivation.
19            Q.    When you transmitted the information to
20    the underwriting, private banking underwriting
21    department, did you have any qualifications or any
22    other additional information besides the required
23    documentation?  I mean, did you give them any
24    instructions?
25            A.    No, sir.  And that was not typical.
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        Q.    When Mimi Huck retired, you inherited,
 2   so to speak, other clients of hers?
 3        A.    Yes.
 4        Q.    What, if anything, in general terms --
 5   I don't know need to know the specifics, but what,
 6   if anything, did she download to you to handle
 7   these new clients?
 8        A.    Well, I had access to her files, the
 9   files for -- the client files.  I don't remember
10   anything else that she downloaded specifically.
11        Q.    When I said "downloaded," I was using
12   that in a more broad sense like if Mimi were to
13   say, "Mr. Corker, here is X, Y, and Z clients.
14   This is what you need to know X, Y, and Z about
15   them."  Did she do anything like that with them?
16        A.    Yeah.  She retired so we spent time on
17   a couple of ongoing deals that she had.  If she
18   had a large client relationship, we talked about
19   it.
20        Q.    Was this high net worth people?
21        A.    Yes, sir.
22        Q.    Did you have any similar conversations
23   with her about Dr. Enright?
24        A.    We did not.  He was not -- yeah.  We
25   did not.
```

Veritext National Deposition & Litigation Services
866 299-5127

1        Q.   He was not among that high net worth?

2        A.   There was nothing specific going on

3  that she felt compelled to cover with me at that

4  time.

5        Q.   In terms of a timeline, how long after

6  Mimi retired did Dr. Enright come to you with the

7  idea that he wanted to borrow money?

8        A.   I don't remember exactly when Mimi

9  retired.  I don't think it was -- if I'm allowed

10  to estimate again, it was probably within a year,

11  about a year.

12        Q.   Okay.

13        A.   It wasn't two years.  I think Mimi

14  might have retired in late 2005 or so.  That's my

15  recollection.  So it was probably less than a

16  year.

17        Q.   When Dr. Enright came to you for the

18  first time after he became your client, did you

19  investigate his history, the relationship of his

20  history with the bank?

21        A.   I did not.  I mean, I did not.  I mean,

22  I'm sure we had a file.  If I had a new client, I

23  would look at a file, so I guess if you want to

24  say that is investigate.

25        I would make sure if there was a client

Veritext National Deposition & Litigation Services
866 299-5127

1  file on a client.  Mimi was very good about
2  keeping files on clients.  So I would have looked
3  at the file and it's customary.
4          Q.   What information was typically in the
5  files that Mimi maintained?
6          A.   Well, if there were previous loans,
7  there would have been loan documents in the file.
8  If there were investment management accounts,
9  there would be copies of the investment management
10  agreements.  If there were requests for changes of
11  title or address or anything else, those sorts of
12  things would be in the file.
13          Q.   Have you reviewed Dr. Enright's file?
14          A.   Had I or?
15          Q.   Have you; do you know?
16          A.   Since I took him on as a client?
17          Q.   Yes.
18          A.   Yeah.  I would have looked at his file
19  because I would have looked to see if there was
20  anything else in there that could have saved
21  him -- because Mimi at that time would keep tax
22  returns in files and things, so I would have
23  looked at the file.
24          MS. McCONNELL:  I just want to clarify, when
25  you say you would have looked, are you speaking in

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    terms of your general practice?  Do you remember
 2    specifically in this case doing that or are you
 3    just speaking in terms of your general practice?
 4          THE WITNESS:  I'm speaking generally.  I
 5    honestly don't remember specifically, but
 6    generally, I would have looked at a client's file.
 7          MS. McCONNELL:  Okay.
 8    BY MR. CLARKE:
 9          Q.   Did you say you would have looked for
10    something to see if there was anything that would
11    save him?
12          A.   I'm sorry?
13          MR. CLARKE:  Would you read back his
14    response, please.
15               (Record read by Reporter.)
16          THE WITNESS:  Oh, so what I meant, in
17    addition to that, it would have saved him time and
18    effort from having to put together tax returns and
19    provide me with additional information, so I would
20    have looked to see.  Thank you.
21               I would have looked to see if there was
22    a tax return in there which would have saved him
23    time from having to go and get the tax return.  I
24    would have said, "Oh, we already have a 2005 tax
25    return so you don't have to do that."
```

```
1              Q.   I got it.
2              MS. McCONNELL:  Matt, I need to take a
3     break.
4                   (Short break taken.)
5     BY MR. CLARKE:
6              Q.   Did you receive a request for documents
7     to bring today?
8              A.   I did.
9              Q.   Did you go through those categories?
10             A.   I did.
11             Q.   And did you determine that you had any
12    that fit within the categories?
13             A.   I don't have anything.
14             Q.   You told me earlier that you left Bank
15    of America rather suddenly, correct?
16             A.   Yes, sir.
17             Q.   Relatively sudden?
18             A.   Relatively.  I mean, they were very
19    nice.  They came in and said, "You need to be out
20    today."  And they were -- "they" being the people
21    that came down from Seattle.  And they were in the
22    offices.  When we left, I think we left a couple
23    of hours after they showed up.
24             Q.   And you didn't take anything with you?
25             A.   I did not.
```

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.   And did you have any Enright materials
2  at a home office or laptop?
3      A.   No.  We were prohibited from keeping
4  things out of the office.
5      Q.   Okay.  And had the bank provided you
6  with a computer for your home?
7      A.   My computer at the time was a laptop
8  that went into a docking station at Bank of
9  America, but I didn't -- we were prohibited from
10  taking files off of that and putting it onto our
11  home computers.
12      Q.   And you complied with that?
13      A.   Yes, sir.
14      Q.   So summing this up, you've looked
15  through the categories and determined that you
16  don't have any documents or did you bring some in
17  with you?
18      A.   I don't have any documents, Matt.
19      Q.   Okay.  Thank you.
20           What is your educational background
21  starting with post high school?
22      A.   Do you want to know where I went or
23  just what my degrees were in?
24      Q.   All the above.
25      A.   I went to -- took a year off after high

Veritext National Deposition & Litigation Services
866 299-5127

```
1    school and worked in construction, manual labor;
2    went to state school, Ramapo College for two
3    years; transferred up to Boston College; got my
4    degree, BS in finance and marketing, from Boston
5    College; and then got an MBA from Fordham
6    University in New York City part time at night.
7         Q.   And when was it that you got your MBA?
8         A.   Good question.  Approximately -- let me
9    think, '89 to '92, something like that,
10   approximately.
11        Q.   And then your BS was what?
12        A.   '84.
13        Q.   Pardon me?
14        A.   1984.
15        Q.   Did you take any -- other than formal
16   education, did you have any training in the field
17   of financial advising or financial affairs?
18        A.   When I was with U.S. Trust Company I
19   took a couple of training classes around trust
20   administration.
21             My time in New York and at U.S. Trust
22   were focused more on the custody and the fiduciary
23   end of the businesses.
24        Q.   And while employed with Bank of America
25   at any time, did you engage in any trainings or
```

Veritext National Deposition & Litigation Services
866 299-5127

1    programs, educational programs?

2         A.   I can't remember anything specific that

3    I went away for.  I mean, they had online

4    compliance-related things that we had to take.

5              They would have an annual off-site that

6    they would bring all of us into up in Seattle and

7    sometimes they would have speakers come in and

8    talk on a specific topic.  But I don't think -- I

9    don't want to read into your question, but I don't

10   think anything like what you are asking about.

11        Q.   Okay.  Do you have any -- I've met some

12   financial advisors who have had several acronyms

13   after their names?

14        A.   I do not.  CFP, CFA.  I don't have

15   those designations.

16        Q.   With regard to Dr. Enright's

17   relationship with the bank, did you receive any

18   sort of extra compensation as a result of any of

19   your activities?

20        A.   No, sir.

21        Q.   So I'm assuming that you got some sort

22   of salary.  There was no bonus or kicker at the

23   end of the year or anything based on Dr. Enright?

24        A.   I had -- I think I have already said --

25   we had sales goals.  I was paid a base salary, and

```
 1    there was a discretionary bonus that I think I
 2    received a couple of times.  I don't remember
 3    exactly when.
 4              But more often than not, though, I did
 5    not get sales goals.
 6         Q.   Was Dr. Enright's loan or loans part of
 7    the calculation into whether you met your sales
 8    goal?
 9         A.   It would have been, yes, sir.
10         Q.   What would that be a part of, what
11    calculation, total dollars loaned or?
12         A.   I'm trying to think how B of A did it.
13              My recollection is that it would be --
14    that they had a formula of some sort for credit as
15    there was a different formula for investment
16    managements, a different formula for deposits.
17    And depending on new business that came in, you
18    would get credit to your sales goals based on the
19    formulaic number.
20         Q.   Essentially, the more loans your
21    clients took out, the more credit you would get
22    under this formula?
23         A.   I think that is fair, yeah.
24         Q.   No commissions though, right?
25         A.   No, sir.
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              Q.   And I think I already asked you this,
 2    but did you receive any compensation for taking
 3    any trust for Mrs. Enright?
 4              A.   I did not.
 5              Q.   Let me show you an -- and we'll mark it
 6    as Exhibit 1 -- it's an e-mail string.  There is
 7    one copy.  And can you not mark on one copy and
 8    we'll attach it as an exhibit.
 9                   If you want to mark on one of them, I'm
10    fine with that.  The top portions is just
11    transmittals from Nancy Enright to us, so the
12    focus is on the bottom portion of the document.
13              (Exhibit 1 marked.)
14    BY MR. CLARKE:
15              Q.   Have you seen this before?
16              A.   I'm sure I wrote it.
17              Q.   So on page --
18              A.   But I haven't seen it since I wrote it,
19    no, sir.
20              Q.   Sure.  On page 2 it looks like the
21    beginning of the e-mail chain is June 17, 2008.
22              A.   Yes.
23              Q.   And the e-mail address is Nancy
24    Enright, but it's --
25              A.   From Lee.
```

Veritext National Deposition & Litigation Services
866 299-5127

1          Q.   -- from Lee.  Is that something you

2    remember receiving e-mails from Lee on a Nancy

3    Enright account?

4          A.   I don't remember that, no.

5          Q.   And it looks like Dr. Enright is

6    informing you that they were at the end of the

7    line of credit; do you see that?

8          A.   Yes, sir.

9          Q.   He also informed you they were close to

10   the end of the Columbia Fund account; do you see

11   that?

12         A.   I do.

13         Q.   Does that refresh your recollection

14   about knowing about the Columbia Fund account?

15         A.   It actually doesn't.  I mean -- no.

16   And I'm just looking at it because I certainly

17   don't remember the Nancy trust having anything to

18   do with Columbia Funds.

19            Yeah, Columbia Funds in my recollection

20   were money market funds.  I mean, I did have two

21   other clients that used Columbia Funds.  And I

22   certainly don't remember Nancy's trust being in

23   the Columbia funds.

24         Q.   Okay.  So if you were aware of a

25   Columbia Fund account, it was just a Columbia

Veritext National Deposition & Litigation Services
866 299-5127

```
1    Fund, not a trust account.
2         A.   Correct.  I mean --
3         Q.   So it looks like this e-mail was sent
4    to you on the 17th of June around mid day.  You
5    responded --
6         A.   1:14 p.m.
7         Q.   Fairly promptly, right?
8         A.   Yes, sir.
9         Q.   And you recount various things that you
10   were doing.
11        A.   Yes, sir.
12        Q.   So is it fair to say that he had
13   already approached you about getting additional
14   credit?
15        A.   I would say based on this, yeah.  Based
16   on my reading of it, that he had already
17   approached me.
18        Q.   Do you know how long before the e-mail
19   he approached you?
20        A.   No, I don't.
21        Q.   Do you remember what his request was?
22        A.   I don't even remember if this was for
23   the first approval.  Because, as I say, I
24   generally remember that it was a million dollars
25   and then it went to a million 250.
```

Veritext National Deposition & Litigation Services
866 299-5127

1         So my guess is that the way this sort
 2    of reads that it was after that, it was an
 3    additional increase.  But I don't remember.  I
 4    don't remember when we would have talked about how
 5    much before that.
 6         Q.   Okay.  You say -- and I'm looking at
 7    the first page, bottom third.
 8         A.   Yes, sir.
 9         Q.   "I have had many conversations with
10    internal partners --
11         A.   Right.
12         Q.   -- et cetera."  Who are internal
13    partners?
14         A.   The underwriters.
15         Q.   Why do you call them "internal
16    partners"?
17         A.   Because that's the way we looked at our
18    business.  I mean, we tried to team on client
19    relationships.  As I say, I was a generalist.  I
20    was not an underwriter.  I was not an investment
21    manager.  I was not the broker of record.
22         I would try to bring those partners in.
23    That's the way I looked at them as partners on
24    relationships.
25         Q.   So you had a number of other bank

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    assets, not in the traditional sense, but assets
 2    in the bank meaning underwriting and other
 3    departments to help you manage your client?
 4         A.   Yes, sir.  Resources.
 5         Q.   Resources, better word.  These weren't
 6    actually your partners, right?
 7         A.   Partners?
 8         Q.   They are not partners in some business.
 9         MS. McCONNELL:  Are you asking like a legal
10    partnership?
11         MR. CLARKE:  Yes.
12         THE WITNESS:  No.  No.  No.  They were other
13    employees of the bank.
14    BY MR. CLARKE:
15         Q.   So they were your partners in servicing
16    the client.
17         A.   Yes, sir.
18         Q.   Okay.  You say, and I'm skipping a
19    sentence, which you can read it for context.
20         A.   Sure.
21         Q.   "Compounding the issues in this
22    particular circumstance, both of the senior credit
23    underwriters who approved this deal structure are
24    no longer with the bank (both left under good
25    circumstances, I would add)."
```

1          Who were those two if you could
2     remember?
3          A.   I certainly -- somebody said he is good
4     with people skills.  I certainly am not good with
5     names, so I absolutely don't remember who those
6     guys were.  No recollection at all of what their
7     names were at this point.
8          Q.   And you chose the words "deal
9     structure" in your e-mail, didn't you?
10          A.   Uh-huh.  Well, I mean, I wrote this, so
11     yeah.
12          Q.   As opposed to "loan," you called it a
13     "deal structure"?
14          A.   Yeah, but that's some bank parlance.
15     When we talk about loans, we talk about loans as
16     deals.  So that is some bank jargon, I think,
17     there.
18          Q.   Why did this require senior credit
19     underwriters as opposed to just ordinary credit
20     underwriters?
21          A.   Because of the size.  I mean, it was a
22     good-sized loan.  I mean, different underwriters
23     have different levels of authority within the
24     underwriting channel.  So certain people would
25     have authority up to 2 million or 4 million or 5

Veritext National Deposition & Litigation Services
866 299-5127

1    or 25, whatever the case may be, so...
2         Q.    Down to what appears to be a new
3    paragraph, it starts with "I know that" second
4    sentence.    "I have spent the last month or so
5    talking to different people in various credit
6    channels within B of A."
7         A.    Yes.
8         Q.    Who did you speak to?
9         A.    I mean, we had dedicated credit
10   resources that we went to.
11             So here's an example, we had a -- there
12   was a channel for mortgages and there was a
13   separate channel for home equity lines.  They
14   weren't underwritten necessarily by the same
15   group.  They were different underwriters.  So
16   those are two different loan channels.
17             And I'm sure, I mean I generally -- I'm
18   sure that in this case I was talking to people in
19   both channels.
20        Q.    Why didn't you just tell Dr. Enright,
21   "Submit an application; we are a lender.  You want
22   a loan, submit an application and we'll consider
23   it"?
24        A.    He was already a credit client.  And as
25   I say, this was -- this was not -- I don't

Page 80

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    remember if this was the first 250,000 that he
 2    requested or if this was -- my guess is that this
 3    was just based on my reading of this, again, my
 4    guess is that this was subsequent to that first
 5    increase.
 6              So he had a million dollar line.  He
 7    came back, gave him another 250.  And then he came
 8    back and said, "I would like to increase that
 9    again."  And so -- I don't know if I answered your
10    question.
11         Q.   So instead of just saying "apply for a
12    loan because we are a lender," you spent a month
13    trying to figure out ways to accommodate
14    Dr. Enright; is that right?
15         A.   Yeah.  It was definitely -- our
16    relationship was in place, it was ongoing, and I
17    know that Dr. Enright -- I know that there was a
18    fairly substantial period of time that he was
19    trying to get an additional increase to the line
20    of credit there.
21         Q.   You say there in that same paragraph,
22    maybe another sentence or two, "Of course, there
23    has been no formal decline of any kind."
24         A.   Right.  So I was having conversations
25    with credit people and saying, you know, "Is there
```

Veritext National Deposition & Litigation Services
866 299-5127

```
1    an opportunity to do more with this client?"
2              And they would have had his file at
3    that point.  And what I was getting back from them
4    was I think how I represented it, that they said,
5    "You need to submit the loan request and they will
6    do the formal underwriting."  And I was just
7    trying to get additional information for
8    Dr. Enright about what was possible or not at that
9    time.
10             And that was essentially what I was
11   getting back from the bank, "Allow us to do a
12   formal underwriting and then we'll give you" -- so
13   I was providing him, as best I could, my
14   understanding, which is this is not a formal
15   decline, but it's not like people are saying,
16   "Sure, we will give him that money."
17             I wasn't getting that kind of feedback
18   at all from the credit people.
19        Q.   You say, "I certainly agree and
20   appreciate that we are coming into a better time
21   for home sales here in the valley."  This is 2008
22   in June?
23        A.   Right.
24        Q.   On what did you base that statement?
25        A.   On Dr. Enright's comment in the fact
```

Page 82

1    that it had been so bad and so unprecedented, so

2    ugly.  And I was responding to Dr. Enright's

3    comments here about we are encouraged by high

4    occupancy figures, higher amount of traffic.

5            I mean, it had been -- when I say the

6    real estate market tanked, I don't think -- I'm

7    not a realtor, but there was like no activity,

8    zero, none, nada.

9            In all of our opinions things had to

10    get a little bit better.  And they did get better,

11    unfortunately, just very, very, very slowly.  And

12    it has dragged on far longer than any of it.

13    Again, I'll just use the word unprecedented in our

14    careers.

15        Q.   Did you agree with what you wrote here

16    that you said, "I certainly agree and appreciate

17    that we are coming into a better time for home

18    sales here in the valley."

19            Was that true when you wrote it?

20        A.   I mean, yeah.  It was so bad.  I'll

21    stand by what I said here, which is in my

22    opinion -- and that's all it was from a

23    non-realtor, it couldn't be any worse.  It could

24    not be any worse then when there were no sales at

25    all.

1         Q.   Next sentence you say, "As we've

2  already discussed, yours is an incredible and

3  unique property."

4         A.   Right.  And I base that --

5         Q.   Let me finish.

6         A.   Sorry.

7         Q.   Just so I get the whole thing into the

8  record.

9         A.   Of course, sorry.

10        Q.   "And when the right buyer comes along,

11  it certainly will sell."

12        A.   Correct.

13        Q.   Was that based upon viewing the

14  property?

15        A.   No.  I had not seen -- that what's I

16  was going to say, Matt.  I had never seen the

17  property.  This was based on Dr. Enright's

18  representations about what an extraordinary

19  property it was.  How it was a unique property,

20  how it was one of a kind.  So I had never seen the

21  property.

22        Q.   I think -- skip a sentence and come to

23  the next one where it says "It is amazing how

24  quickly three years go by."

25        A.   Yes, sir.

1    Q.   Are you referring to an amount of time
2    for which you had calculated his line of credit
3    would sustain the debt?
4         A.   No.  I think I was talking about --
5    well, yeah.  I mean, I was talking about the
6    extent of our relationship.  We had started
7    working about three years prior to that.  And it
8    was amazing to me that we were three years into
9    all of this.
10        I mean, so I don't remember if it was
11   specific to the loan.  I mean, I think that was
12   more of a general comment that here we are three
13   years down the road in our relationship.  It's
14   amazing how quickly that period of time can go by.
15        Q.   Back to page 2.
16        A.   Yes, sir.
17        Q.   At the top "please note as of
18   10/15/07 --
19        A.   Uh-huh.
20        Q.   -- my new e-mail address is
21   robert.corker@ustrust."
22        A.   Yes.
23        Q.   How does that work on an e-mail dated
24   June 17, 2008?
25        A.   So, I mean -- I'll try and answer that.

Veritext National Deposition & Litigation Services
866 299-5127

1    So when they bought U.S. Trust, and again, if we
2    are inquiring -- what they ended up calling it was
3    U.S. Trust Bank of America Private Wealth
4    Management.  So there was the name of the
5    business.
6              But they coded into all of our
7    e-mails -- that was not something I coded.  That
8    was hard coded -- that my e-mail address had
9    changed as of '07 and this was June of '08.  So
10   they were still letting people know that I was no
11   longer at Bank of America.  I was now at a
12   U.S. Trust e-mail address.
13        Q.   Okay.  Did you choose your title or did
14   somebody else assign that title to you?
15        A.   That title was assigned.
16        Q.   When did you become senior vice
17   president as opposed to vice president?
18        A.   You know, that's a good question.  I
19   don't know.  I mean, I don't think -- I mean this
20   is going back to 2002.  I can tell you this
21   because I know this for a fact, I had not gotten a
22   salary increase.  It was just the way it was
23   structured in the time I was there.
24              But I can't remember if I was -- I
25   could have been hired as a senior vice president,

Veritext National Deposition & Litigation Services
866 299-5127

1     not a vice president.  So I could have been a
2     senior vice president the whole time.  At Wells
3     Fargo I'm a vice president.  So I could have been
4     a senior vice president when they hired me in '02.
5              I honestly don't remember, Matt.  I
6     certainly didn't get a promotion.  It could have
7     had a title change at some point during my seven
8     years there.  I just don't remember.
9          Q.   What is the office of supervisory
10    jurisdiction information, you see that?
11         A.   Yeah, because we were licensed
12    representatives, a series 7, 63 license, even
13    though I didn't use my license, we were required
14    on all of the e-mails to have that.  That was
15    something again that was hard coded that I didn't
16    put on there.
17         Q.   Is that true of the footer at the
18    bottom of the e-mail where it says "investment
19    products"?
20         A.   Yes, sir.  All of those were hard
21    coded, not mine.
22         Q.   So whenever you opened an e-mail, it
23    was automatically there?
24         A.   Yes, sir.  And that was something that
25    compliance would check for us to make sure that

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        was all there.
 2            Q.   If you are sending e-mails out without
 3        that, you would get in trouble or something?
 4            A.   Right.
 5            (Exhibit 2 marked.)
 6        BY MR. CLARKE:
 7            Q.   All right.  So here is -- and would you
 8        mind giving the court reporter one of those?
 9        Thank you very much.
10                So I've handed you what I've marked as
11        Exhibit No. 2.  Starting at the bottom third,
12        there's an e-mail string.  Take a minute to look
13        at those, please.
14            A.   Okay.
15            Q.   First question is Robert Corker from to
16        Robert Corker.
17            A.   Right.  So what I would do is I sent
18        out a blast e-mail to all of my clients who took
19        e-mail.  And so I didn't disclose who those
20        clients were, I sent it to myself and BCC'd a list
21        of people.
22            Q.   Okay.  And the explanation you gave to
23        your clients was that the bank was downsizing?
24            A.   Yeah.  I mean, that's accurate.
25            Q.   Okay.
```

1          A.   Yes, sir.  I mean, it was a layoff, not
2     a termination for cause.
3          Q.   So Brett Barton and Shelley Smith were
4     going to take over all of your clients including
5     Dr. Enright?
6          A.   Yes, sir.
7          Q.   Did you have any conversation at all
8     with Brett Barton or Shelley Smith about
9     Dr. Enright?
10          A.   No.  What happened, Matt, is -- so we
11     were informed, and you can see this e-mail, we
12     were informed on February -- or thereabouts, might
13     have been the day before -- that our last day was
14     going to be March 5th.
15               And then on or about -- and I don't
16     remember exactly what day it was -- someone else
17     showed up in our office and said, "You know, your
18     last day is today.  You guys need to go today."
19     And so we ended up leaving about a week or so
20     earlier than we had even expected.
21          Q.   Okay.
22          A.   So we did not have a chance to go
23     through all clients.  I don't remember covering
24     any clients with Brett because it was -- we
25     thought we were going to be there until the 5th,

Veritext National Deposition & Litigation Services
866 299-5127

1    and we were let go sooner than that.

2          Q.   And you say that "These two people

3    Mr. Barton and Ms. Smith are good and long

4    standing partners."  What did you mean by that?

5          A.   Meaning we were part of the same team.

6    Our Idaho team was -- it was really the four of us

7    and we were always looked at as a team.  Two

8    associates and two bankers, two relationship

9    officers.  And so I considered them partners in

10   that regard.

11         Q.   Who was who?  There were two associates

12   and two --

13         A.   So Shelley Smith and Colette Pruitt

14   were the assistants, and Brett Barton and I were

15   the relationship officers.

16         Q.   Okay.  I see.  I got it.  All right.

17   Would you hand the court reporter one of those.

18         (Exhibit 3 marked.)

19   BY MR. CLARKE:

20         Q.   Take a look at Exhibit 3, please.

21         A.   Uh-huh.  Okay.

22         Q.   So you authored the bottom portion of

23   Exhibit 3; is that correct?

24         A.   Yes, sir.

25         Q.   And it was sent from which address; do

Veritext National Deposition & Litigation Services
866 299-5127

```
1    you know?
2         A.   That was sent from the Sun Valley gmail
3    address.
4         Q.   The Bob Corker address at the from
5    section is which address?
6         A.   Say that again.  I'm sorry, Matt.
7         Q.   Under original message there's a "from
8    line."  Is that e-mail the same e-mail as
9    Corker.sunvalley@gmail?
10        A.   Yes.  So this was -- yeah,
11   Corkersunvalley.gmail, right, was not my work
12   address.
13        Q.   So this e-mail was sent from outside
14   Bank of America?
15        A.   Right.  I was no longer an employee;
16   that's correct.
17        Q.   And you are doing what?  What is the
18   gist of this?
19        A.   I was saying goodbye because we had
20   been let go, and I didn't have an opportunity to
21   say goodbye to clients.
22        Q.   Okay.  And there's a reference in here
23   it says "Management --
24        A.   Yes, sir.
25        Q.   -- had decided they would not -- that
```

Page 91

1      we would not be kept on until March 5th.

2      Apparently they believed that we may have been

3      feeling client dissatisfaction over their decision

4      to no longer staff the Ketchum Private Banking

5      office."

6            A.   Yes, sir.  Some clients were

7      dissatisfied that there was no longer going to be

8      private banking officers located in this town, in

9      this valley and that they were going to be covered

10     out of an office two and a half hours away.  And

11     apparently a couple of clients decided to call

12     management and voice their dissatisfaction.

13            And I believe -- and I think I said

14     that, I believe -- because I don't know for sure

15     because they never really gave us a reason.  They

16     just came and said -- they were very nice, but

17     they said you need to leave today.

18            So it was the only thing we could come

19     up with as a possible explanation as to why we

20     would have been asked to leave suddenly and

21     unexpectedly.

22            Q.   Did Dr. Enright express to you at any

23     time that he was upset or dissatisfied with your

24     departure?

25            A.   I don't remember.  I don't remember

1    that.

 2          Q.   Was there any communication between the

 3    bank and you about handling the Dr. Enright loans

 4    as being a part of why you were being let go?

 5          A.   No, never.  No.  Not even -- that never

 6    even remotely entered into my -- you know, it was

 7    my assistant and I.  And this was at a time, Matt,

 8    when everybody -- there were layoffs across the

 9    country.  This was a downsizing.  This was not a

10    specific event for just Colette and myself.

11          Q.   So there was no reprimands or

12    counseling about --

13          A.   Absolutely not.

14          Q.   Let me finish.  I know what the answer

15    is, but let me just finish it.

16          A.   Sure.

17          Q.   No reprimands or counseling about the

18    handling of the Enright financial affairs.

19    Answer?

20          A.   No.

21          Q.   Okay.  Let me just check my notes.

22               Do you know of any appraisal of the

23    Santa Ynez property?

24          A.   Huh-uh.  I don't remember one.  I will

25    say if the bank made a loan against that property,

1      there would have been an appraisal.

 2           Q.   Okay.

 3           A.   So that was standard practice.

 4           MR. CLARKE:  All right.  I'm done.  Now what

 5      did we do?  Off the record.

 6           (Proceedings concluded at 11:09 a.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

1        I declare under penalty of perjury

2   under the laws that the foregoing is

3   true and correct.

4        Executed on _____ , 20___,

5   at _____, _____.

6

7

8

9

10                    _____

11                    ROBERT JOHN CORKER, JR.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              R E P O R T E R ' S   C E R T I F I C A T E

 2

 3

 4              I, Roxanne K. Patchell, a Notary Public

 5      in and for the State of Idaho, do hereby certify:

 6              That prior to being examined, the

 7      witness named in the foregoing deposition was by

 8      me duly sworn to testify the truth, the whole

 9      truth, and nothing but the truth;

10              That said deposition was taken down by

11      me in shorthand at the time and place therein

12      named and thereafter reduced into typewriting

13      under my direction, and that the foregoing

14      transcript contains a full, true, and verbatim

15      record of the said deposition.

16              I further certify that I have no

17      interest in the event of the action.

18              WITNESS my hand and seal July 12, 2012.

19

20

21

        NOTARY PUBLIC in and for the State of Idaho;
22      residing at Boise, Idaho.

23

        My commission expires September 8, 2017
24      CSR No. 733

25
```

Page 96

**Exhibit 3**

**BrokerCheck Report**

# ROBERT JOHN CORKER JR

CRD# 1657622

Report #66824-65020, data current as of Wednesday, July 25, 2012.

| **Section Title** | **Page(s)** |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |



**FINRA**

# About BrokerCheck®

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.

User Guidance



# Report Summary for this Broker

## ROBERT J. CORKER JR

CRD# 1657622

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

Currently employed by and registered with the following FINRA Firm(s):

**WELLS FARGO ADVISORS, LLC**
411 N. MAIN ST.
KETCHUM, ID 83340
CRD# 19616
Registered with this firm since: 01/03/2011

## Broker Qualifications

**This broker is registered with:**

- 5 Self-Regulatory Organizations
- 2 U.S. states and territories

**Is this broker currently suspended or inactive with any regulator? No**

**This broker has passed:**

- 0 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

## Registration History

This broker was previously registered with FINRA at the following brokerage firms:

**WELLS FARGO INVESTMENTS, LLC**
CRD# 10582
KETCHUM, ID
09/2009 - 01/2011

**BANC OF AMERICA INVESTMENT SERVICES, INC.**
CRD# 16361
KETCHUM, ID
03/2003 - 09/2009

**UST FINANCIAL SERVICES CORP.**
CRD# 36881
NEW YORK, NY
03/1995 - 12/1995

## Disclosure Events

Disclosure events are certain criminal matters; regulatory actions; civil judicial proceedings; customer complaints, arbitrations, or civil litigations; employment terminations; and financial matters in which the broker has been involved.

**Are there events disclosed about this broker?  No**

## Investment Adviser Representative Information

This individual is a broker and an investment adviser representative. For more information about investment adviser representatives, visit the SEC's Investment Adviser Public Disclosure website at : http://www.adviserinfo.sec.gov

1

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 5 SROs and is licensed in 2 U.S. states and territories through his or her employer.**

## Employment 1 of 1

Firm Name: **WELLS FARGO ADVISORS, LLC**

Main Office Address: **ONE NORTH JEFFERSON AVENUE**
**ST. LOUIS, MO 63103**

Firm CRD#: **19616**

| SRO | Category | Status | Date |
|---|---|---|---|
| FINRA | General Securities Representative | APPROVED | 01/03/2011 |
| NASDAQ OMX PHLX, Inc. | General Securities Representative | APPROVED | 09/30/2011 |
| NASDAQ Stock Market | General Securities Representative | APPROVED | 01/03/2011 |
| NYSE MKT LLC | General Securities Representative | APPROVED | 07/29/2011 |
| New York Stock Exchange | General Securities Representative | APPROVED | 01/24/2011 |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| Idaho | Agent | APPROVED | 01/03/2011 |
| Oregon | Agent | APPROVED | 01/03/2011 |

## Branch Office Locations

**WELLS FARGO ADVISORS, LLC**
411 N. MAIN ST
KETCHUM, ID 83340

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.

FINRA

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

This individual has passed 0 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| Investment Company Products/Variable Contracts Representative Examination | Series 6 | 10/27/1994 |
| General Securities Representative Examination | Series 7 | 03/03/2003 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 11/03/1994 |
| Uniform Combined State Law Examination | Series 66 | 12/30/2002 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.



# Registration and Employment History

## Registration History

This broker previously was registered with FINRA at the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 09/2009 - 01/2011 | WELLS FARGO INVESTMENTS, LLC | 10582 | KETCHUM, ID |
| 03/2003 - 03/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | 16361 | KETCHUM, ID |
| 03/1995 - 12/1995 | UST FINANCIAL SERVICES CORP. | 36881 | NEW YORK, NY |
| 04/1987 - 10/1989 | CITICORP FINANCIAL SERVICES,INC. | 14675 | |

## Employment History

Below is the broker's employment history for up to the last 10 years.

**Please note that the broker is required to provide this information only while registered with FINRA and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 01/2011 - Present | WELLS FARGO ADVISORS LLC | KETCHUM, ID |
| 04/2009 - Present | WELLS FARGO BANK, N.A. | KETCHUM, ID |
| 04/2009 - 01/2011 | WELLS FARGO INVESTMENTS, LLC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANK OF AMERICA, N.A. | KETCHUM, ID |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

No information reported.

©2012 FINRA. All rights reserved.    Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.


FINra

End of Report

This page is intentionally left blank.

©2012 FINRA. All rights reserved.   Report# 66824-65020 about ROBERT J. CORKER JR. Data current as of Wednesday, July 25, 2012.



**Exhibit 4**



**Investment Adviser Representative Public Disclosure Report**

# ROBERT JOHN CORKER JR

CRD# 1657622

Report #71663-51060, data current as of Wednesday, July 25, 2012.

| **Section Title** | **Page(s)** |
| --- | --- |
| Report Summary | 1 |
| Qualifications | 2 - 3 |
| Registration and Employment History | 4 |



**IAPD Information about Investment Adviser Representatives**

IAPD offers information on all current-and many former-Investment Adviser Representatives. Investors are strongly encouraged to use IAPD to check the background of Investment Adviser Representatives before deciding to conduct, or continue to conduct, business with them.

- **What is included in a IAPD report?**
  IAPD reports for individual Investment Adviser Representatives include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards.

  It is important to note that the information contained in an IAPD report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the Investment Adviser Representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in IAPD comes from the Investment Adviser Registration Depository (IARD) and FINRA's Central Registration Depository, or CRD®, (see more on CRD below) and is a combination of:

  - information the states require Investment Adviser Representatives and firms to submit as part of the registration and licensing process, and
  - information that state regulators report regarding disciplinary actions or allegations against Investment Adviser Representatives.

- **How current is this information?**
  Generally, Investment Adviser Representatives are required to update their professional and disciplinary information in IARD within 30 days.

- **Need help interpreting this report?**
  For help understanding how to read this report, please consult NASAA's IAPD Tips page http://www.nasaa.org/IAPD/IARReports.cfm.

- **What if I want to check the background of an Individual Broker or Brokerage firm?**
  To check the background of an Individual Broker or Brokerage firm, you can search for the firm or individual in IAPD. If your search is successful, click on the link provided to view the available licensing and registration information in FINRA's BrokerCheck website.

- **Are there other resources I can use to check the background of investment professionals?**
  It is recommended that you learn as much as possible about an individual Investment Adviser Representative or Investment Adviser firm before deciding to work with them. Your state securities regulator can help you research individuals and certain firms doing business in your state. The contact information for state securities regulators can be found on the website of the North American Securities Administrators Association http://www.nasaa.org.




# Investment Adviser Representative Report Summary

## ROBERT JOHN CORKER JR (CRD# 1657622)

The report summary provides an overview of the Investment Adviser Representative's professional background and conduct. The information contained in this report has been provided by the Investment Adviser Representative, investment adviser and/or securities firms, and/or securities regulators as part of the states' investment adviser registration and licensing process. The information contained in this report was last updated by the Investment Adviser Representative, a previous employing firm, or a securities regulator on **09/30/2011**.

## CURRENT EMPLOYERS

**WELLS FARGO ADVISORS, LLC**
IARD# 19616
411 N. MAIN ST.
KETCHUM, ID 83340
Registered with this firm since: 01/03/2011

## QUALIFICATIONS

This Investment Adviser Representative is currently registered in **1** jurisdiction(s).

Is this Investment Adviser Representative currently suspended with any jurisdiction? **No**

**Note:** Not all jurisdictions require IAR registration or may have an exemption from registration.
Additional information including this individual's qualification examinations and professional designations is available in the Detailed Report.

## REGISTRATION HISTORY

This Investment Adviser Representative was previously registered with the following Investment Adviser firms:

| FIRM (IARD#) - LOCATION | REGISTRATION DATES |
|---|---|
| WELLS FARGO INVESTMENTS, LLC (IARD# 10582) - KETCHUM, ID | 09/22/2009 - 01/03/2011 |
| BANC OF AMERICA INVESTMENT SERVICES, INC. (IARD# 16361) - KETCHUM, ID | 03/05/2003 - 03/06/2009 |

For additional registration and employment history details as reported by the individual, refer to the Registration and Employment History section of the Detailed Report.

## DISCLOSURE INFORMATION

Disclosure events include certain criminal charges and convictions, formal investigations and disciplinary actions initiated by regulators, customer disputes and arbitrations, and financial disclosures such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this Investment Adviser Representative? **No**

## BROKER DEALER INFORMATION

This individual is a broker and an investment adviser representative. For more information about broker individuals, visit FINRA's BrokerCheck website at: http://www.finra.org/brokercheck



# Investment Adviser Representative Qualifications

## REGISTRATIONS

This section provides the states and U.S. territories in which the Investment Adviser Representative is currently registered and licensed, the category of each registration, and the date on which the registration became effective. This section also provides, for each firm with which the Investment Adviser Representative is currently employed, the address of each location where the Investment Adviser Representative works.

This individual is currently registered with **1** jurisdiction(s) through his or her employer(s).

## Employment 1 of 1

| | |
|---|---|
| Firm Name: | **WELLS FARGO ADVISORS, LLC** |
| Main Address: | ONE NORTH JEFFERSON AVENUE |
| | H0006-028 |
| | ST. LOUIS, MO  63103-2205 |
| Firm IARD#: | 19616 |

| U.S. State/ Territory | Status | Date |
|---|---|---|
| Idaho | Approved | 01/03/2011 |

## Branch Office Locations

**WELLS FARGO ADVISORS, LLC**
411 N. MAIN ST.
KETCHUM, ID  83340



# Investment Adviser Representative Qualifications

## PASSED INDUSTRY EXAMS

This section includes all required state securities exams that the Investment Adviser Representative has passed. Under limited circumstances, an Investment Adviser Representative may attain registration after receiving an exam waiver based on a combination of exams the Investment Adviser Representative has passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on an Investment Adviser Representative's specific qualifying work experience. Exam waivers and grandfathering are not included below.

This individual has passed the following exams:

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination (S63) | Series 63 | 11/03/1994 |
| Uniform Combined State Law Examination (S66) | Series 66 | 12/30/2002 |

## PROFESSIONAL DESIGNATIONS

This section details that the Investment Adviser Representative has reported **0** professional designation(s).

No information reported.



# Investment Adviser Representative Registration and Employment History

## PREVIOUSLY REGISTERED WITH THE FOLLOWING INVESTMENT ADVISER FIRMS

This section indicates that state registration records show this Investment Adviser Representative previously held registrations with the following firms:

| Registration Dates | Firm Name | IARD# | Branch Location |
|---|---|---|---|
| 09/22/2009 - 01/03/2011 | WELLS FARGO INVESTMENTS, LLC | 10582 | KETCHUM, ID |
| 03/05/2003 - 03/06/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | 16361 | KETCHUM, ID |

## EMPLOYMENT HISTORY

Below is the Investment Adviser Representative's employment history for up to the last 10 years.

**Please note that the Investment Adviser Representative is required to provide this information only while registered and the information is not updated after the Investment Adviser Representative ceases to be registered, with a state regulator. Therefore, an employment end date of "Present" may not reflect the Investment Adviser Representative's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 01/2011 - Present | WELLS FARGO ADVISORS LLC | KETCHUM, ID |
| 04/2009 - Present | WELLS FARGO BANK, N.A. | KETCHUM, ID |
| 04/2009 - 01/2011 | WELLS FARGO INVESTMENTS, LLC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANC OF AMERICA INVESTMENT SERVICES, INC. | KETCHUM, ID |
| 10/2002 - 03/2009 | BANK OF AMERICA, N.A. | KETCHUM, ID |

## OTHER BUSINESS ACTIVITIES

This section includes information, if any, as provided by the Investment Adviser Representative regarding other business activities the Investment Adviser Representative is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent, or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious, or fraternal and is recognized as tax exempt.

No information reported.


# End of Report

This page is intentionally left blank.

**Exhibit 5**

**BrokerCheck Report**

# BANC OF AMERICA INVESTMENT SERVICES, INC.

CRD# 16361

Report #72531-23538, data current as of Wednesday, July 25, 2012.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Registration and Withdrawal | 2 |
| Firm Profile | 3 - 7 |
| Firm History | 8 |
| Firm Operations | 9 - 57 |
| Disclosure Events | 58 |





# About BrokerCheck®

BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.

  Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.nasaa.org.

- **Are there other resources I can use to check the background of investment professionals?**
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

Thank you for using FINRA BrokerCheck.

 Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

 For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources.
For more information about FINRA, visit www.finra.org.



# Report Summary for this Firm

## BANC OF AMERICA INVESTMENT SERVICES, INC.

CRD# 16361
SEC# 8-33805

This report summary provides an overview of the brokerage firm. Additional information for this firm can be found in the detailed report.

## Main Office Location

100 FEDERAL ST
HEADQUARTERS
BOSTON, MA 02110

## Mailing Address

101 S. TRYON STREET, 19TH FLOOR
NC1-002-19-44
CHARLOTTE, NC 28255

## Business Telephone Number

980-387-6385

This firm is a brokerage firm and an investment adviser firm. For more information about investment adviser firms, visit the SEC's Investment Adviser Public Disclosure website at:
http://www.adviserinfo.sec.gov

## Firm Profile

This firm is classified as a corporation.

This firm was formed in Florida on 06/14/1984.

Its fiscal year ends in December.

## Firm History

Information relating to the brokerage firm's history such as other business names and successions (e.g., mergers, acquisitions) can be found in the detailed report.

## Firm Operations

This brokerage firm is no longer registered with FINRA.

## Disclosure Events

Disclosure events are certain criminal matters, regulatory actions, civil judicial proceedings, and financial matters in which the brokerage firm or one of its control affiliates has been involved.

Are there events disclosed about this firm?    **Yes**

The following types of disclosures were reported:

Regulatory Event

Civil Event

Arbitration

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

# Registration Withdrawal Information

This section provides information relating to the date the brokerage firm ceased doing business and the firm's financial obligations to customers or other brokerage firms.

| | |
|---|---|
| This firm terminated or withdrew registration on: | 10/23/2009 |
| Does this brokerage firm owe any money or securities to any customer or brokerage firm? | Yes |
| Number of customers owed funds or securities: | 2 |
| Amount of money owed to customer: | $0.00 |
| Amount of money owed to brokerage firm: | $0.00 |
| Market value of securities owed to customer: | $18,758.58 |
| Market value of securities owed to brokerage firm: | $0.00 |
| Payment arrangement: | WILL TRANSFER SECURITIES TO CUSTOMER ACCOUNT AT NFS |

**FINRA**

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.



# Firm Profile

This firm is classified as a corporation.

This firm was formed in Florida on 06/14/1984.

Its fiscal year ends in December.

## Firm Names and Locations

This section provides the brokerage firm's full legal name, "Doing Business As" name, business and mailing addresses, telephone number, and any other name by which the firm conducts business and where such name is used.

**BANC OF AMERICA INVESTMENT SERVICES, INC.**
**Doing business as BANC OF AMERICA INVESTMENT SERVICES, INC.**

**CRD#** 16361

**SEC#** 8-33805

### Main Office Location

100 FEDERAL ST
HEADQUARTERS
BOSTON, MA 02110

### Mailing Address

101 S. TRYON STREET, 19TH FLOOR
NC1-002-19-44
CHARLOTTE, NC 28255

### Business Telephone Number

980-387-6385

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

# Firm Profile

## Direct Owners and Executive Officers

This section provides information relating to all direct owners and executive officers of the brokerage firm.

| | |
|---|---|
| Legal Name & CRD# (if any): | MERRILL LYNCH & CO., INC. |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Position | SHAREHOLDER |
| Position Start Date | 09/2009 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | BENSON, MARK JARRETT 1915552 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | PRESIDENT/CEO/DIRECTOR/CHAIRMAN |
| Position Start Date | 03/2009 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | CALL, JOHN SCOTT 2815968 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | SVP/CHIEF COMPLIANCE OFFICER/DIRECTOR OF COMPLIANCE |
| Position Start Date | 03/2009 |

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

finra

# Firm Profile

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| **Legal Name & CRD# (if any):** | NEWTH, RONALD JOSEPH |
| | 1454390 |
| **Is this a public reporting company?** | No |
| **Does this owner direct the management or policies of the firm?** | No |
| **Percentage of Ownership** | Less than 5% |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF OPERATING OFFICER/DIRECTOR |
| **Position Start Date** | 11/2008 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | Yes |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Is this a public reporting company?** | No |
| **Legal Name & CRD# (if any):** | OSAKI, ISAAC |
| | 4910551 |
| **Is this a domestic or foreign entity or an individual?** | Individual |
| **Position** | CHIEF LEGAL OFFICER |
| **Position Start Date** | 02/2009 |
| **Percentage of Ownership** | Less than 5% |
| **Does this owner direct the management or policies of the firm?** | No |
| **Is this a public reporting company?** | No |
| **Legal Name & CRD# (if any):** | ROMANO, JOHN GARY |

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.



# Firm Profile

## Direct Owners and Executive Officers (continued)

5078610

**Is this a domestic or foreign entity or an individual?**
Individual

**Position**
CFO/DIRECTOR

**Position Start Date**
03/2009

**Percentage of Ownership**
Less than 5%

**Does this owner direct the management or policies of the firm?**
No

**Is this a public reporting company?**
No



©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

# Firm Profile

This section provides information relating to any indirect owners of the brokerage firm.

## Indirect Owners

| | |
|---|---|
| Legal Name & CRD# (if any): | BANK OF AMERICA CORPORATION |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Company through which indirect ownership is established | MERRILL LYNCH & CO., INC. |
| Relationship to Direct Owner | SHAREHOLDER |
| Relationship Established | 01/2009 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | Yes |

©2012 FINRA. All rights reserved.     Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.

FINra

# Firm History

This section provides information relating to any successions (e.g., mergers, acquisitions) involving the firm.

No information reported.

©2012 FINRA. All rights reserved.    Report# 72531-23538 about BANC OF AMERICA INVESTMENT SERVICES, INC. Data current as of Wednesday, July 25, 2012.



FITU1a

# Firm Operations

## Registrations

This section provides information about the regulators (Securities and Exchange Commission (SEC), self-regulatory organizations(SROs), and U.S. states and territories) with which the brokerage firm is currently registered and licensed, the date the registration became effective, and certain information about the firm's SEC registration.

**This firm is no longer registered with FINRA.**

**The firm's registration with FINRA was from 12/23/1985 to 01/04/2010.**